IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

   v.                               Case No. 07-CR-57

THOMAS C. BALSIGER, et al.,

        Defendants.

## MEMORANDUM OF THE UNITED STATES
## IN OPPOSITION TO DEFENDANTS' PRIVILEGE CLAIMS

In May 2007, pursuant to a Cooperation Agreement, International Outsourcing Services ("IOS") voluntarily waived its attorney-client and work-product privileges. At the same time, the law firms representing IOS waived any work-product claims, and IOS directed those firms to produce all of IOS's files to the United States. Since that time, individual defendants have had an opportunity to review those records and assert individual and/or joint-defense privilege claims. Between June 15, 2007, and the filing of this memorandum, the United States has received in excess of 1,500 pages of privilege logs from defendants Thomas C. Balsiger (a/k/a "Chris" Balsiger), James Currey, Bruce Furr, Lance Furr, and Steven Furr.

Pursuant to the Court's February 11, 2008 scheduling order, the United States submits this memorandum regarding the defendants' privilege claims. For the reasons set forth below, the Court should reject the vast majority of the defendants' assertions.

## I.     Background.

On March 6, 2007, the grand jury indicted IOS, one of the nation's largest coupon processors, and 11 individuals on 25 counts of wire fraud. R.1. The indictment alleged that as

part of a long-running scheme, IOS falsely invoiced coupons to manufacturers as having been redeemed at IOS's large retail clients when, in fact, those coupons had never been redeemed at a store or had been submitted to IOS by smaller stores that were far more likely to have their coupons rejected due to fraud concerns. *See id.* ¶ 16 (alleging the essence of the defendants' scheme was to defeat manufacturers' fraud controls and obtain money from manufacturers for retail coupons that the defendants knew to be fraudulent). The indictment further alleged that the scheme included accounting fraud, false statements to banks, and other sophisticated measures to conceal the defendants' crimes. *Id.* ¶¶ 22-28.

### A.     IOS's privilege waiver.

On May 17, 2007, the United States agreed to dismiss – without prejudice – the pending charges against IOS. The United States agreed to this after the corporation agreed to take several steps, including:

- Cooperating completely in the ongoing prosecution of individuals concerning the charged fraud scheme as well as in the investigation and prosecution of IOS's executives for possible obstruction of justice both before and after the indictment;

- Installing a new management team and removing the indicted individuals from their roles with the company;

- Placing all putative distributions to shareholders, including any potential proceeds if the company were ever sold, in escrow pending resolution of the criminal cases;

- Making IOS employees and representatives available for interview and testimony as necessary;

- Making all of its files available to the United States for unrestricted inspection and use in the criminal cases; and

- Voluntarily waiving its attorney-client privilege, securing work-product waivers from the law firms of Scott, Hulse, Marshall, Feuille, Finger & Thurmond, P.C. ("Scott Hulse"), Greenberg Traurig LLP ("GT"), and Mallor Clendening, Grodner & Bohrer LLP ("MCGB"), and directing those law firms to provide their

complete IOS files to the United States.

*See* R. 83.

### B.    Superseding indictment.

On December 5, 2007, the grand jury returned a superseding indictment. R. 131.  With some modifications (including additional venue allegations), Counts 1 through 25 of the superseding indictment mirrored the charges in the original indictment.  The superseding indictment added two counts: a wire-fraud conspiracy (Count 26) and an obstruction conspiracy (Count 27).

The obstruction conspiracy is relevant to the application of the crime-fraud exception to the defendants' current privilege claims.  This count alleged 22 separate acts (or in some cases series of acts) in furtherance of an overall goal to obstruct the ongoing grand jury investigation into IOS's fraudulent invoicing and accounting practices.  These acts broadly fell into two categories: (1) attempts to prevent the grand jury from getting information – by hiding or destroying documents, attempting to prevent witnesses from cooperating, and retaliating against cooperating witnesses; and (2) attempts to use witnesses and lawyers to provide false information to the grand jury, prosecutors, and a district court judge responsible for presiding over grand jury matters.  *See* R. 131 at ¶ 53.

Of the 22 separate acts in furtherance of the charged conspiracy, at least 14 were committed after August 10, 2005, when the United States informed IOS that it was a target of the criminal investigation. *See id.* at ¶ 53(h)-(v).  All but 3 of those acts involved attempts to use attorneys directly or indirectly to unwittingly further the conspiracy.  These alleged acts show that during the 19 months leading up to the indictment, not only were the defendants not truly

cooperating with the investigation (as they publicly claimed), but such "cooperation" was

actually a tactic to advance the broader obstruction agenda and make the investigation go away.[1]

### C. Submission of privilege logs by individual defendants.

Despite the privilege waivers by IOS and its lawyers in May 2007, the United States did

not immediately seek to review any of the law firms' files. Rather, the United States wanted to

make sure that individual defendants had an opportunity to review the files for any individual,

joint defense, or common interest privilege claims. As of March 1, 2008, the United States only

has reviewed select GT documents for which no privilege claims were asserted and has not yet

received or reviewed any Scott Hulse files.

In the 9 months since IOS's privilege waiver, the United States has received 13 separate

privilege logs from the Furr defendants and defendants Balsiger and Currey. With respect to the

Scott Hulse materials, the defendants submitted the following logs:

1. Lance Furr log for paper documents (dated 6/15/07) [Ex. B];
2. Steven Furr log for paper documents (dated 6/18/07) [Ex. C];
3. Currey / Balsiger log for Scott Hulse paper records (dated 9/17/07);
4. Currey / Balsiger log for "IOS Supplemental CD" of electronic materials (dated 9/17/07);
5. Currey / Balsiger log for "Privileged E-mails" (dated 9/17/07);
6. Furr joint log for electronic records (dated 10/2/07) [Exs. D-1 & D-2]; and
7. Currey / Balsiger log for "Case Related E-mail" (dated 12/10/07).[2]

The United States received the following privilege logs for the GT records:

---

[1]This practice may be seen, for example, in providing 2 company employees, Nereo Castillo and Carlos Zapata, for interviews with the United States on April 25, 2006. Prior to the interviews and prior to meeting with IOS's attorneys, various defendants had persuaded Mr. Castillo and Mr. Zapata to provide false information. *See* R. 131 at ¶ 53(s); *see also* Exs. G, I..

[2]Ovidio Enriquez asserted privilege for a single document in Scott Hulse's files. The United States does not contest that assertion.

1. Currey / Balsiger log for "Greenberg Traurig Documents at U.S Attorney's Office" (dated 12/10/07);
2. Furr Defendants' "UPDATED Privilege Log re: Greenberg Traurig Documents Provided to Government" (dated 12/27/07) [Ex. E];
3. Currey / Balsiger log for "Greenberg Traurig Privileged E-mail" (dated 12/10/07);
4. Currey / Balsiger log for "Richmond & Finger IOS GTemail #1 & #2" (dated 12/24/07 and adopted by Furr defendants on 1/23/08);
5. Furr Defendants' Supplemental Privilege Log got GT documents (dated 1/23/08) [Ex. F]; and
6. Currey / Balsiger log for Greenberg Traurig Documents Nos. 200000 through 201664 (dated 1/25/08).[3]

There are no privilege issues remaining with respect to the records of the third firm, MCGB. Although a privilege dispute had arisen in the context of a grand jury subpoena to that firm, the parties narrowed the dispute to a single document. On September 19, 2007, in Case No. 07-Misc.-48, United States District Court Judge Lynn S. Adelman found that because the document in question – a February 9, 2006, e-mail from Attorney Geoffrey Grodner at MCGB to Attorney Jim Richmond at GT – related to IOS's efforts to retaliate against a cooperating witness, Kari Costello, by suing her in Indiana state court, the crime-fraud exception applied. A redacted copy of the September 19, 2007, Order is attached as Exhibit H.

**D.    Current status.**

As indicated in this office's February 8, 2008 letter to the Court, attorneys for the United States and other interested parties – the Furr defendants, Chris Balsiger, and James Currey – held a conference on February 7, 2008, to discuss issues surrounding the privilege litigation. During the conference, attorneys for Messrs. Balsiger and Currey said they would greatly reduce their

---

[3]Counsel for Mr. Balsiger had indicated that he intended to assert privilege claims for records Bill Clark, a former IOS consultant, had agreed to provide to the United States. Mr. Balsiger's counsel indicated he would produce a privilege log for those materials by January 21, 2008. To date, no log has been submitted for those materials.

privilege claims, based on those discussions.  This is significant, given that the logs submitted by these two defendants totaled well in excess of 1,200 pages.  On those logs, privilege had been asserted for documents which could never be privileged – including e-mails and letters to and from Assistant United States Attorneys, copies of presentations made to prosecutors, documents already disclosed to the United States, interviews with auditors, historical business records, etc.

On February 17, 2008, James Darnell, the attorney for Mr. Currey, reported that preparing the pared-down logs was taking more time than anticipated.  As a result, the United States does not yet have the pared-down logs.  Because it would make no sense to waste the Court's time and resources by filing and addressing their out-of-date logs, in the text that follows, the United States will not include a document-by-document analysis of the claims contained in Mr. Balsiger and Mr. Currey's logs.  Instead, this response will review applicable privilege law, discuss how some of the major issues in the case relate to the privilege claims, and apply the facts of the case and privilege law to some of the privilege logs, including the Furrs' claims for hard-copy documents and some of their claims for electronic materials.  In addition, to assist the Court's analysis, the United States has attached a "cheat sheet" of relevant individuals. *See* Ex. A.

**II.    Applicable Legal Principles.**

**A.    Attorney-client privilege generally.**

The attorney-client privilege protects communications made in confidence by a client to his attorney in the attorney's professional capacity for the purpose of obtaining legal advice. *United States v. Evans,* 113 F.3d 1457, 1461 (7th Cir. 1997).  The purpose of the privilege is to encourage full disclosure and to facilitate open communication between attorneys and their

clients. *Swidler and Berlin v. United States,* 524 U.S. 399, 403 (1998). However, because "the privilege has the effect of withholding relevant information," courts construe the privilege narrowly to apply only where necessary to achieve its purpose. *Fisher v. United States*, 425 U.S. 391, 403 (1976); *see also United States v. White*, 970 F.2d 328, 334 (7th Cir. 1992) (explaining that the privilege must be "strictly confined").

The Seventh Circuit has adopted eight, well-settled principles that delineate the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983).

The attorney-client privilege is limited to situations in which the attorney is acting as a legal advisor. Confidential communications with a lawyer about business and other non-legal matters are not privileged. *In re Sulfuric Acid*, 235 F.R.D. 407, 414-15 (N.D. Ill. 2006); *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003) (business advice not protected). The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney. *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981). For this reason, a client cannot conceal a fact merely by revealing it to his attorney. *Id*.

A party that seeks to invoke the attorney-client privilege has the burden of establishing all of its essential elements. *Evans*, 113 F.3d at 1461. Additionally, the privilege "must be made and sustained on a document-by-document basis." *White*, 970 F.2d at 334.

**B.      Attorney-client privilege in the corporate context.**

The attorney-client privilege applies to corporations as well as to individuals. *Upjohn*, 449 U.S. at 390. "The administration of the attorney-client privilege in the case of corporations, however, presents special problems. As an inanimate entity, a corporation must act through agents. A corporation cannot speak directly to its lawyers." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985). Nevertheless, any privilege that exists as to a corporate officer's role and functions within a corporation belongs to the corporation, not the officer. *Id.* To underscore that point, the Supreme Court noted in *Weintraub* that:

> New managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney-client privilege with respect to communications made by former officers and directors. Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties.

*Id*.

"It is often difficult to determine whether a corporate officer or employee may claim an attorney-client privilege in communications with corporate counsel." *In re Grand Jury Subpoena*, 274 F.3d 563, 571-72 (1st Cir. 2001). To assist in this determination, several courts have adopted the test set forth in *In re Bevill, Bresler & Schulman Asset Mgt. Corp.*, 805 F.2d 120 (3d Cir. 1986). The *Bevill* test delineates five benchmarks that corporate employees seeking to assert a personal claim of attorney-client privilege must meet:

> First, they must show they approached [counsel] for the purpose of seeking legal advice. Second, they must demonstrate that when they approached [counsel] they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that the [counsel] saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with [counsel] were confidential. And fifth, they must show that the substance of their conversations with [counsel] did not concern matters within the company or the general affairs of the company.

*Id*. at 123; *see also In re Grand Jury Subpoena*, 274 F.3d at 571-72; *Grand Jury Proceedings v. United States*, 156 F.3d 1038, 1041 (10th Cir. 1998); *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 215 (2d Cir. 1997); *In re Sealed Case*, 29 F.3d 715, 719 n.5 (D.C. Cir. 1994).

Although the Seventh Circuit has not expressly adopted the *Bevill* test, the case is nevertheless instructive. In *Bevill*, two corporate officers objected to a district court order requiring disclosure of substantive communications with corporate counsel. *See* 805 F.2d at 121-24. Both the officers and the two corporations involved were the subjects of criminal investigations. *Id.* The officers asserted that their communications were protected by the attorney-client privilege, but the district court disagreed, finding that the corporation had effectively waived the privilege. *Id.* The Third Circuit affirmed, finding that the communications were made in their roles as corporate officials:

> [The officers] contend that because their personal legal problems were inextricably intertwined with those of the corporation, disclosure of discussions of corporate matters would eviscerate their personal privileges.... The appellants' argument, however, does not pay sufficient attention to the fact that under existing law, any privilege that exists as to a corporate officer's role and functions within a corporation belongs to the corporation, not the officer.

*Id.* at 124-25.

In the same vein, the Seventh Circuit has rejected the contention that "an individual's mere subjective belief that he is represented . . . will always be sufficient to demonstrate that such a relationship existed for the purpose of the attorney client privilege." *United States v. Keplinger*, 776 F.2d 678, 701 (7th Cir. 1985). In *Keplinger*, corporate managers charged with mail fraud, wire fraud, and making false statements sought to suppress the introduction of testimony and materials obtained from corporate counsel after the corporation had waived its attorney-client privilege. *Id.* at 699. The defendants asserted that the materials had been

obtained in violation of their individual attorney-client privilege, notwithstanding the fact that

the defendants had never sought individual legal advice or asked questions relating to personal

representation. *Id.* at 700. In rejecting the defendants' argument, the court explained:

> [A]t least in the absence of any relatively clear indication by the potential client
> to the attorney that he believed he was being ... represented, we think no ...
> attorney-client relationship can be inferred without some finding that the
> potential client's subjective belief is minimally reasonable.

*Id*.

### C.    Work-product.

The work-product doctrine protects documents prepared by an attorney or the attorney's

agent to analyze and prepare the client's case. *United States v. Nobles*, 422 U.S. 225, 238-39

(1975); *Hobley v. Burge*, 433 F.3d 946, 949 (7th Cir. 2006). However, this protection extends to

the work of the attorney's agents, not the client's agents. *Nobles*, 422 U.S. at 238-39. The work-

product doctrine only provides qualified protection from discovery for materials prepared in

anticipation of litigation. *Hickman v. Taylor*, 329 U.S. 495, 512 (1947). The test is "whether, in

light of the nature of the document and the factual situation in the particular case, the document

can fairly be said to have been prepared or obtained because of the prospect of litigation." *Binks*

*Mfg. Co. v. National Presto Indus. Inc.*, 709 F.2d 1109, 1119 (7th Cir. 1983). By contrast,

documents prepared in the ordinary course of a party's business, even if prepared at a time when

litigation was reasonably anticipated, are not protected work-product. *Id.* at 1119-20*; Evans v.*

*City of Chicago*, 231 F.R.D. 302, 310 (N.D. Ill. 2005).

Because an attorney has an independent privacy interest, the work-product privilege may

be invoked by either the client or the attorney. *Hobley*, 433 F.3d at 949. The party seeking to

assert the work-product privilege bears the burden of establishing that the privilege applies.

*Binks* 709 F.2d at 1119-20

### D.    Waiver.

Although confidential communications between clients and attorneys are privileged, the privilege is available only where the client has maintained the confidentiality of the communication. *In re Cont'l Sec. Litig.*, 732 F.2d 1302, 1314 (7th Cir. 1984); *see also Burden-Meeks*, 319 F.3d at 901-02 (neither attorney-client nor work-product privilege survives disclosure by the client to third parties). "Any voluntary disclosure by the holder of the attorney-client privilege is inconsistent with the attorney-client confidential relationship and thus waives the privilege." *Powers v. Chicago Transit Auth.*, 890 F.2d 1355, 1359 (7th Cir. 1989); *In re Pebworth*, 705 F.2d 261, 263-64 (7th Cir. 1983) (virtually any disclosure of a privileged communication to third parties vitiates the privilege). The presence of a third party defeats the attorney-client privilege even though the client may harbor a desire for confidentiality. *Evans*, 113 F.3d at 1462. As the First Circuit has put it, "the privilege evaporates the moment that confidentiality ceases to exist." *In re Keeper of the Records*, 348 F.3d 16, 23 (1st Cir. 2003). The burden of showing that the privilege was not waived and that any disclosure was inadvertent is on the party asserting the privilege. *Evans*, 113 F.3d at 1461.

When a client transmits information to an attorney with knowledge that it will be transmitted to a third party, the information is not confidential. *Lawless*, 709 F.2d at 487. For example, materials transmitted to an accountant are not subject to the attorney-client privilege unless the accountant is acting as an agent of an attorney for the purpose of assisting with the provision of legal advice. *In re Grand Jury Proceedings*, 220 F.3d 568 (7th Cir. 2000). "If what is sought is not legal advice but only accounting service ... or if the advice sought is the

accountant's rather than the lawyer's, no privilege exists." *Id.* (quoting *United States v. Brown*, 478 F.2d 1038, 1040 (7th Cir. 1973)); *see also United States v. Arthur Young & Co.,* 465 U.S. 805, 817-19 (1984) (there is not accountant-client privilege); *United States v. Frederick*, 182 F.3d 496, 500 (7th Cir. 1999) (same). Similarly, in the corporate context, the privilege can be waived if a communication is shared with corporate employees who are not directly concerned with or did not have primary responsibility for the subject matter of the communication. *Muro v. Target Corp.*, 243 F.R.D. 301 (N.D. Ill. 2007).

The standard for determining the scope of a waiver of attorney-client privilege is that "the waiver applies to all other communications relating to the same subject matter." *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340,1349 (Fed. Cir. 2005) (citing *In re Cont'l Sec. Litig.*, 732 F.2d at 1314 n.18). "The waiver extends beyond the document initially produced out of concern for fairness, so that a party is prevented from disclosing communications that support its position while simultaneously concealing communications that do not." *Id.* For example, when a party discloses an attorney-client communication to defend its actions, it waives the attorney-client privilege as to all such communications regarding the same subject. *See In re EchoStar,* 448 F.3d 1294, 1301 (Fed. Cir. 2006); *Garcia v. Zenith Elec. Corp.*, 58 F.3d 1171, 1175 n.1 (7th Cir. 1995). Some courts also have held that "parts of draft letters ultimately disclosed to third parties via the final version ... must be disclosed due to waiver." *See, e.g., American Nat'l Bank & Trust v. AXA Client Solutions, LLC*, Case No. 00 C 6786, 2002 WL 1058776 at *2 (N.D. Ill. Mar. 22, 2002).

E.      **Common interest / joint defense doctrine.**

The common interest / joint defense doctrine extends the attorney-client privilege to

otherwise non-confidential communications in limited circumstances. *United States v. BDO Seidman LLP,* 492 F.3d 806, 815-16 (7th Cir. 2007). The doctrine "allows a defendant to assert the attorney-client privilege to protect his statements made in confidence not to his own lawyer, but to an attorney for a co-defendant for a common purpose related to the defense of both." *Evans*, 113 F.3d at 1467 (quoting *Keplinger*, 776 F.2d at 701). Because the doctrine only applies where the parties have undertaken a joint effort with respect to a common legal interest, the doctrine is limited strictly to those communications made in furtherance of an ongoing enterprise. *BDO Seidman,* 492 F.3d at 816.

Where a defendant seeks the protection of the common interest or joint defense doctrine, the defendant bears the burden of establishing the existence of a joint defense agreement. *United States v. Weissman*, 195 F.3d 96, 99 (2d Cir. 1999); *United States v. Moss,* 9 F.3d 543, 550 (6th Cir. 1993); *Minebea Co., Ltd v. Papst*, 228 F.R.D. 13 (D.D.C. 2005); *United States v. LeCroy*, 384 F. Supp.2d 375 (E.D. Pa. 2004); *United States v. Salvagno*, 306 F. Supp.2d 258 (N.D.N.Y. 2004). Parties making such a claim must also show: (1) a communication made in the course of a joint defense effort; (2) the communication was in furtherance of that effort; and (3) the privilege has not been waived. *Bevill*, 805 F.2d at 126.

"A [joint defense agreement] is not an escape-proof prison. Indeed, public policy mandates that a participant in a [joint defense agreement] must be free to withdraw from it, unilaterally." *LeCroy*, 348 F. Supp.2d at 382. A joint defense agreement without the right of prospective withdrawal violates public policy because it would prevent one party to the agreement from determining that its own interests required it to cooperate with the government. *Id*. When a member of a joint defense agreement withdraws, that member may disclose

13

information he learned prior to the beginning or independent of the joint defense effort. *Salvagno*, 306 F. Supp.2d at 273. This includes, of course, the ability of the former member to voluntarily waive privilege for any confidential information that party had disclosed to the group. *See In re Grand Jury Subpoena*, 274 F.3d 563; *see also BDO Seidman,* 492 F.3d at 817 (explaining that the privileged status of communications falling within the common interest or joint defense doctrines cannot be waived without the consent of all parties who had provided the confidential information).

### F.    Crime-fraud exception.

The relationship between client and counsel may be abused. For this reason, communications that would otherwise be protected by the attorney-client privilege or work-product doctrine are not protected if the communications are made in furtherance of contemplated or ongoing criminal or fraudulent conduct. *See United States v. Zolin*, 491 U.S. 554, 562-63 (1989) (crime-fraud exception applies when counsel's advice is used to cover up or perpetuate a crime or fraud); *In re Special September 1978 Grand Jury (II)*, 640 F.2d 49, 59 (7th Cir. 1980). If such evidence of a crime or fraud exists, then the "seal of secrecy is broken," and the privilege is inapplicable. *United States v. Al-Shahin*, 474 F.3d 941, 946 (7th Cir. 2007). This is so regardless of whether the attorney was unwittingly used by the client. *United States v. Davis*, 1 F.3d 606, 610 (7th Cir. 1993) (applying crime-fraud exception where client tricked attorney into providing false information to grand jury)*, see also* Ex. H (finding crime-fraud exception applied to February 9, 2006, e-mail from MCGB to Attorney Richmond at GT).

To invoke the crime-fraud exception, the United States must make a *prima facie* showing that "gives color to the charge" that its allegations of wrongdoing have some foundation in fact.

*Al-Shahin*, 474 F.3d at 946. A *prima facie* case is established when a party produces "sufficient evidence to justify the district court in requiring the proponent of the privilege to come forward with an explanation for the evidence offered against it." *BDO Seidman,* 492 F.3d at 818 (citing *In re Feldberg*, 862 F.2d 622, 626 (7th Cir. 1988)). The relevant inquiry is not whether the evidence supports a verdict but whether it calls for inquiry. *Id.* at 818-19. This generally involves showing that probable cause exists to believe that a crime has been attempted and that the communications at issue were in furtherance thereof. *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 769 (7th Cir. 2006); *Davis*, 1 F.3d at 609. In determining whether there is *prima facie* evidence of criminal or fraudulent activity, the court should consider the totality of the circumstances. *BDO Seidman,* 492 F.3d at 819.

**III.    General analysis of the defendant's privilege logs.**

Before turning to a specific analysis of particular logs, the United States first will address several matters relating to the scope of the defendants' privilege claims.

**A.    Adequacy of logs.**

In many cases, the defendants' logs do not contain sufficient information to enable a document-by-document analysis of the privilege claims. To permit a given privilege claim to be evaluated, at a minimum the log must disclose as to each item:

(1) whose confidential communication is involved;

(2) to whom the confidential communication was made;

(3) in what context the confidential communication was made; and

(4) the general subject matter of the confidential communication.

*See Holifield v. United States*, 909 F.2d 201, 204 (7th Cir. 1990).

Although the Furrs' logs generally are more complete than those submitted by Mr. Balsiger and Mr. Currey, even the Furrs' logs do not always specifically identify which Furr defendant's allegedly confidential information is at issue. As is explained in Section IV below, it appears that in some instances, the Furrs are claiming privilege for IOS communications which do not reveal any Furr defendant's personal, confidential information. In addition, there are some entries that are undated or have no known author.

Accordingly, the United States requests that the Court order the defendants to explain which individual's confidential information or which attorney's work-product is reflected in each document for which they are attempting to establish that a privilege applies and has not been waived.

**B.** **The joint defense agreement.**

Most of the defendants' privilege claims rely on the joint defense doctrine. The United States has not been provided with a copy of any joint defense agreement ("JDA"). The United States has been told that the agreement was an oral one, as a written agreement was drafted but never signed. E-mails on the Furrs' logs show draft agreements being circulated in September and October 2005. *See, e.g.,* Ex. D-1 at pp. 2-4. The Court should require the defendants to explain the parameters of the joint defense, who was a member (the United States has received conflicting information), and what the provisions of the agreement were with respect to withdrawal and the treatment of any individual attorney's work-product. *See* Section II.E above.

The United States assumes there could not have been a JDA prior to August 10, 2005. On that date, the United States informed IOS that it was a target of the fraud investigation due to

evidence indicating the company had invoiced coupons to manufacturers through its bigger chain store funded accounts that were allegedly sent to IOS from small independent stores.[4] The United States further assumes that all the indicted defendants except William Babler, plus IOS and Rex Furr, were members of the JDA from the outset.[5] While Kevin Perry, who is now a witness, may have at one time seen himself as part of a JDA, by not later than February 2006, when he was interviewed as a cooperating, immunized witness, he was no longer part of the JDA. The United States further assumes that cooperating witnesses Debby Flynn, Kari Costello, and Christine Peak, nor any other present or past employees or consultants for IOS (including Bill Clark), were never part of the JDA. Accordingly, with respect to JDA or common interest privilege, the United States assumes that: (1) no valid JDA or common interest privilege can be claimed for communications prior to August 10, 2005; and (2) no valid JDA or common interest privilege can be asserted for communications with attorneys other than those for IOS, the indicted defendants, and Rex Furr. Similarly, the sharing of confidential communications with attorneys for other persons or entities waived the privilege.

### C. Claims of privilege by corporate officers.

To the United States's knowledge, IOS never had in-house counsel. Many documents list Attorney David Bernard or Scott Hulse as "General Counsel." It appears that this firm advised officers of the company about various business and legal matters, and that Attorney Bernard regularly attended board meetings as the board's secretary. Attorney Richard

---

[4]The United States informed counsel for IOS which individuals were targets of the investigation on or about September 7, 2005, and privilege logs indicate an e-mail to attorneys for these targets as members of a JDA on or about September 21, 2005.

[5]On May 3, 2006, Babler's defense counsel represented to the United States that Babler was not in a joint defense agreement.

Munzinger at Scott Hulse also advised IOS about business and litigation matters.

After IOS became aware of the United States's investigation in February 2003, IOS hired attorney Ronald Ederer to represent IOS. Following notice to IOS on August 10, 2005, that the company was a target, IOS hired attorney James Richmond and the GT firm in Chicago to replace Mr. Ederer as lead counsel in the criminal investigation. For some limited purposes having to do with personnel in the IOS Bloomington office, IOS retained the MCGB from 2004 through 2006.

To the United States's knowledge, none of these lawyers represented any of the indicted defendants in their individual capacities. All of the legal work of Attorneys Bernard, Munzinger, Ederer, and Richmond, as well as other attorneys, investigators,[6] and accountants whom they directed in the course of their work for IOS, was done on behalf of IOS, not any corporate officer or other individual.[7]

In accordance with established privilege law, the United States assumes that IOS officers, including the indicted defendants, typically dealt with these attorneys and the attorneys' agents not in their individual capacities, but as officers and/or employees of IOS. Similarly, James

_____

[6] The retainer document for investigator James McGuire indicates he was retained by GT to assist that firm's representation of IOS and that all of McGuire's work product belonged to GT. *See* Ex. J. Attorney Richmond also advised interviewees that Mr. McGuire worked for him and that any statements to Mr. McGuire were covered by a privilege that only IOS could waive. *See, e.g.,* Ex. K. Accordingly, GT's waiver included McGuire's work product as well.

[7] Attorney David Bernard also is a personal friend of Mr. Balsiger. Along with many others, he accompanied Mr. Balsiger on "The Balsiger Expedition" to climb Mt. Everest during 2006. Although Mr. Bernard's dual roles of corporate lawyer and friend-to-the-CEO means that he in all likelihood dealt with Mr. Balsiger in both professional and personal roles, the personal aspect of the relationship does not transform Mr. Balsiger's confidential communications about IOS legal matters to Mr. Bernard into communications made in Mr. Balsiger's personal capacity. Unless Mr. Balsiger can specifically show otherwise, when the two men discussed IOS, Mr. Balsiger is presumed to have dealt with Mr. Bernard in a corporate, not an individual capacity.

Currey appears to have dealt with these attorneys on behalf of IOS and as an outside vendor. Since these attorneys have all waived work product privilege, unless the defendants can show on a document-by-document basis that the particular communications for which they now assert privilege were strictly personal – and not in their roles as IOS employees and executives – it appears likely that nearly all of their privilege claims were defeated by IOS's privilege waiver. *See* Ex. H (questioning whether Bruce Furr's communications referenced in an e-mail among IOS's lawyers were made in a personal capacity or on behalf of IOS).

### D. Crime-fraud exception.

The United States does not seek to use the crime fraud exception – or anything else – as a tool to invade the legitimate confidentiality protected by the attorney-client or work product privileges. Confidential communications regarding after-the-fact historical matters, unless designed to falsify or conceal past events, do not lose their otherwise privileged status because they concerned a crime.

In this case, however, the grand jury returned a superseding indictment, which included detailed allegations of attempts by IOS and individual defendants to use lawyers (unwittingly) to obstruct justice. By securing the superseding indictment, the government has made a sufficient showing that communications that furthered any of the charge acts should not be protected due to the crime-fraud exception. Concerning all such communications, the proponents of the privilege, who have superior knowledge about the communications, must now show why the privilege should not be overcome by the crime-fraud exception.

The defendants should have to provide such an explanation for any documents containing communications that furthered or concealed any of the following acts:

19

1. Responses to any manufacturer or retail store client regarding IOS invoicing practices [*see* ¶ 53(c)];
2. Attempts to terminate, negotiate with, sue, or attribute wrongdoing in any way to Christine Peak, Kari Costello, or Kevin Perry  [*see* ¶ 53(d-f), (m)];
3. Communications with or about Riya [*see* ¶ 53(g)];
4. Accounting issues or practices, restatement of earnings, or other dealings with BKD [*see* ¶ 53(i), (p-q), (t)];
5. Explanations of IOS invoicing practices and use of store tags, including explanations prepared for attorneys, the government, or the district court [*see* ¶ 53(j-l), (n-p), (u-v)]; and
6. Meetings, interviews, or other dealings with Nereo Castillo or Carlos Zapata [*see* ¶ 53(s)].

As an aid to the Court, here is a detailed explanation of two of the subjects that may get the most attention in the Court's analysis of the crime-fraud exception:  the store tag defense, and the accrual.

### 1.    The store tag defense.

Some of the documents for which privilege has been asserted appear to relate to an alleged attempt by some of the defendants to use attorneys to present a false "store tag" defense to the United States Attorney's Office, the FBI, and the grand jury.  This defense, which forms the basis for many of the charged acts of obstruction, asserted that although IOS had billed coupons from small stores on invoices listing only a single, larger store, this was done only as a matter of convenience (the coupons were processed at the same location) and efficiency (including supposedly to save toner).  The defense further posited that although the coupons were shipped together, no one could have been defrauded because each packet of coupons contained a "store tag" that accurately listed the store at which they purportedly had been redeemed.

In reality, the "store tag" defense was completely false.  When IOS invoiced coupons purportedly redeemed at small stores along with coupons from larger stores, IOS had created

store tags that falsely listed the larger store as the location at which all of the coupons had been received. *See, e.g.,* Exs. G, I, L.

This defense apparently started to take shape soon after August 10, 2005, when IOS received a target letter. *See* Exs. M, N. To support the defense, IOS employees and representatives, including Mr. Balsiger, Mr. Currey, and Attorney David Bernard began giving a series of power point presentations and plant tours to educate individual defense counsel on IOS's purported invoicing practices. It appears that the dates upon which such power points or presentations were made by Mr. Balsiger, Mr. Currey, and/or lawyers for IOS included: August 18, 2005, August 31, 2005, September 1, 2005, September 12, 2005, September 21, 2005, November 3, 2005, March 29, 2006, and/or April 28, 2006. In addition, on November 3, 2005, Mr. Currey apparently presented 5 theories to explain how "some of the coupons IOS has submitted to manufacturers/agents as coming from large chains have actually come from independent stores" and further presented a definition of "co-mingling and co-packing" to various attorneys. *See* Ex. O.

### a. The "white paper."

By December 9, 2005, IOS's legal team decided that it was time to consider preparing a memorandum on the defense that could be converted into a "white paper," that presumably could be presented to the United States to attempt to avoid indictment. *See* Ex. P. Based on information provided by Mr. Balsiger that allegedly described IOS's historical invoicing practices, Attorney Richard Munzinger and others at the Scott Hulse firm began drafting the "white paper" by January 2006. *See* Exs N, Q.

This memorandum went through at least 11 revisions. On behalf of IOS, Mr. Balsiger

typically presented the factual information.  He assigned Bill Clark[8] to obtain exhibits and shuttle information to and from Scott Hulse. The white paper eventually was titled,  "IOS Should Not be Indicted for Mail/Wire Fraud."  Consistent with its title, Mr. Clark understood this memo to be "a premise for a defense or treatise."

On May 23, 2006, the FBI recovered a version of the memo from Lance Furr's office at IOS-Bloomington during execution of a search warrant.  Some of the exhibits to the memo also were recovered from his office.  A copy of the memo recovered during the search is attached as Exhibit S.  Although IOS initially asserted privilege over the version of the document recovered from Lance Furr's office, that assertion was later withdrawn, and no individual defendant has asserted such a claim.

The final document, including a host of attached exhibits apparently occupies an entire binder.  The last version of this document was completed in August 2006.

### b.  The March 2006 creation of false invoices.

In March 2006, a plant tour was arranged for attorneys representing IOS and individual IOS employees.   Although similar tours were held on other occasions, the purpose of this tour was to look for evidence which could be used to support the IOS Statement of Invoicing Practices being prepared by Attorney Munzinger.  The tour was set to take place on March 29, 2006, in Acuna, Mexico.

In advance of the tour, Mr. Balsiger directed employees to create invoices that could be

---

[8]Mr. Clark was hired as an outside consultant to IOS.  *See* Ex. R. As a conduit for information between IOS and its attorneys during the period of the JDA, he acted on behalf of IOS, not any individual defendant or defendant's attorney.  Mr. Clark did not view himself as being a member of the JDA, and expressed concern when disclosures were made to him that doing so would waive the privilege.

used to support IOS's store tag defense. Mr. Balsiger directed Ovidio Enriquez, David Howard, Nereo Castillo, and others to create invoices showing that although smaller, store coupons were included with invoices that listed only a larger, funded retailer, the smaller store's coupons had accurate "store tags" identifying the store at which they purportedly had been redeemed. *See* Exs. G, I, L.

Because IOS's store tag defense was a fabrication, IOS's system would not allow the creation of invoices desired by Mr Balsiger. As a result, on March 27, 2006, James Currey had a programmer at his firm alter IOS's system to allow Mr. Enriquez, Mr. Howard, Mr. Castillo and others to generate "real time" invoices that would appear consistent with the false "store tag" defense. *See* Exs. G, I, L; *see also* Ex. T (copy of Currey Adkins billing records).

Two days later, on March 29, 2006, Kevin Finger and others, including the lawyers for Mr. Enriquez, toured the IOS plant at Acuna. During the tour, Mr. Enriquez, Mr. Howard, and other IOS employees generated one – or possibly more – fraudulent invoices to substantiate the store tag defense.

One such invoice is attached as Exhibit U. The invoice, which was created in "real time" for the visiting attorneys, included Kimberly Clark coupons with a store tag from a Larry's Market in De Pere, Wisconsin, on the same invoice as coupons from Winn-Dixie.[9] Not only was this invoice contrived, but David Howard had to bring the "Larry's" coupons from another IOS plant to even generate the invoice in the first place. *See* Ex. L.

c. **The January 10, 2007, presentation and follow-up.**

---

[9]The format of IOS's invoices also had changed. During much of the period covered by the charged scheme, the invoice stated to remit payment to the retailer (e.g., Winn Dixie). By March 2006, following the receipt of the target letter, the invoices stated to remit payment to "Winn Dixie c/o IOS."

In November and December 2006, IOS's attorneys asked to meet with the United States before any indictment was returned. On December 13, 2007, IOS and the United States scheduled such a session for January 10, 2007. Attorneys Richmond and Finger indicated at that session, that they hoped to receive additional information but that they also would explain IOS's defenses.

At the January 10, 2007, meeting, Attorneys Finger and Richmond presented the "store tag" defense to the United States Attorney's Office and the FBI. *See* Exs. V, W. As Attorney Finger later confirmed, the January 10, 2007, presentation was based on the IOS Statement of Invoicing Practices described above. *See* Ex. W.

The January 10, 2007, meeting included a power point presentation regarding IOS's invoicing practices and how its claimed use of store tags meant that there had been no attempt to defraud anyone. Attorney Finger based this presentation on the final version of the "IOS Should Not be Indicted" memo prepared by the Scott Hulse firm. As part of the presentation, Attorney Finger also displayed the false invoice created in Acuna, Mexico, on March 29, 2006. The presentation also included additional exhibits from the "IOS Should Not be Indicted Memo." *See* Ex. W.

In January through April 2007, IOS also caused its lawyers at the Scott Hulse firm to rely on this defense when attempting to quash a grand jury subpoena directed to that firm. Specifically, between January and April 2007 in Matter No. 07-Misc.-26 (LSA), Attorney Munzinger and IOS relied on the store tag defense when claiming that certain records fell outside of the crime-fraud exception to the attorney-client privilege. Similarly, on March 7, 2007, one of IOS's attorneys, James Richmond, wrote a letter to the Deputy Attorney General of

the United States, asking him (unsuccessfully) to block or delay the indictment of IOS. The letter repeated the store tag defense.

Ultimately, to determine whether IOS's defense had merit, investigators analyzed the March 29, 2006, invoice presented by Attorneys Finger and Richmond. As an initial matter, this invoice seemed inconsistent with all of the other evidence obtained by investigators assisting the grand jury, including 8 tons of coupons and their related invoices. There was no record of such an invoice ever having been sent to Kimberly Clark or its agent. Ultimately, various IOS employees admitted that the invoice was contrived and that the store tag defense was false. *See* Exs. G, I, L.

### 2. The accrual.

Another series of charged obstructive acts relates to an alleged attempt by some of the defendants to use attorneys and auditors to pass on false information and/or prevent truthful information about IOS book keeping practices from being told. *See* R. 131 at ¶ 53(d), (i), (q) (r) & (t). "Accrual" was IOS's term for holding the books open to record future anticipated income in the current month. This practice began when IOS income from coupons declined after the company curtailed its practice of invoicing coupons purportedly received from small stores as if they had been submitted from large retail chain stores. This decline in income made IOS unable to report enough income each month to comply with the banks holding IOS's debt. IOS therefore made false statements in its financial records to mislead the banks about their loan collateral.

During the period between August 2005, when informed of their target status and thereafter assured the United States of their cooperation, and indictment on March 6, 2007,

several defendants obstructed the investigation by lying to and obstructing IOS's auditor BKD and IOS's banks about the accrual. Additionally, these defendants sought to falsely discredit the witnesses they knew to be truthfully cooperating with the investigation about the accrual. As in the case of the store tag defense, the defendants allegedly used their attorneys to further their obstructive conduct.

The accrual began in or about 2003. On January 28, 2005, defendant Babler, in his capacity as IOS Chief Financial Officer, which he had held since November 2004, wrote an e-mail that included as recipients Christine Peak and Kevin Perry. These were two IOS employees, who later became cooperating witnesses. Mr. Babler directed that pursuant to prior company practice, IOS would

> estimate unrecorded revenues and expenses and accrue them as of December 31, 2004. We will accrue revenues for 2004 ... using the first two weeks of January ... Coupons - 2 weeks ... We will cut off the recording of 2004 invoices as of Monday, January 31. To recognize expenses incurred but not booked as of the cut off, we will accrue expenses for the same time period above using 20% of the total expenses for those weeks.

*See* Ex. X.

Another accrual-related document recovered during the May 2006 search of the IOS Bloomington office revealed that knowledge of the accrual went to the top of the company, and the finance department only carried out orders from the top of the company. This hand-printed note in Lance Furr's writing which was contained in a folder in his office about October 2005 financial statements, stated:

<u>Per TCB</u>
for All Divisions
November Needs to
<u>Be 5 - Week Month</u>
Let's Discuss

*See* Ex. Y.  Mr. Balsiger's initials are "TCB."  This note corroborates Kevin Perry and Christine

Peak, who told the United States that the accrual was Mr. Balsiger's idea, and that he had told

defendant Lance Furr what numbers were needed in any given month to comply with IOS's

banks' requirements.

This January 2005 e-mail of Mr. Babler's, and October/November 2005 note of Lance

Furr's, show the truth about the accrual:  (1) it went back several years; (2) it was directed by

Balsiger through his subordinates, first Lance Furr and then Mr. Babler; and (3) Messrs. Furr and

Babler directed others in the IOS financial department, such as Kevin Perry and Christine Peak,

to make the false entries.  But this is not what defendants told their lawyers, their auditor BKD,

or the banks, when the accrual came to light.  Nor was this what the defendants told BKD when

they knew that any information they provided to BKD would be provided to the grand jury.

As alleged in the superseding indictment, on February 15, 2005, IOS reached a separation

agreement with employee Christine Peak, designed to prevent her from revealing information

about IOS invoicing and accounting practices, such as the accrual.  After the United States

sought to interview Ms. Peak in about August of 2005, IOS provided counsel for her.  On

September 7, 2005, in an e-mail to Bill Clark, through whom employees would communicate

with then-IOS CEO and now defendant Balsiger, Kevin Perry discussed the false statements on

the company's books for the months of June and July of that year.  *See* Ex. Z.

IOS's lawyers at GT learned of the accrual by not later than September 9, 2005, when

Ms. Peak's IOS-provided counsel told GT that Ms. Peak (who could not have been part of the

joint defense agreement and simultaneously cooperating with the investigation) had made false

entries in IOS books at the direction of Lance Furr.  Ms. Peak's lawyer promised to delay Peak's

interview with the United States. On October 25, 2005, that same counsel reported to GT that Kevin Perry, whom that lawyer co-represented for several weeks, confirmed everything Ms. Peak had said about false accounting entries, and that these false entries ("accrual") happened after IOS experienced losses in the tens of millions of dollars after it ceased invoicing Riya (small store) coupons through large stores. *See* Ex. AA. This lawyer told GT he had told Lance Furr's attorney about Ms. Peak's statements, and agreed to also tell Lance Furr's attorney about Kevin Perry's similar statements.

On October 27, 2005, the United States learned about the accrual upon interviewing Christine Peak. The next day, Ms. Peak's lawyer again told GT the contents of the interview, as well as Lance Furr's attorney.

On November 18, 2005, GT's investigator, Jim McGuire, noted that IOS's financial data did not add up. On December 20, 2005, Bill Clark e-mailed GT that Mr. Balsiger had him re-work some items, including things related to Howard McKay and cash bonuses.[10] As part of IOS's effort to improve its financial appearance after the diversion of coupons ended, Mr. McKay, at Mr. Balsiger's direction, created "ghost shipments" of coupons to appear that stores which had not shipped coupons to IOS for more than one year, and which supposedly owed IOS money due to coupon chargebacks, had recently shipped coupons. These "ghost shipments" misled IOS's auditor BKD, and resulted in BKD not forcing IOS to write down large amounts of stale chargebacks. This had the effect of increasing the inaccuracy in IOS's financial records.

By early January 2006, GT was considering hiring the accounting firm Price Waterhouse

_____

[10]Cash bonuses referred to payments made to IOS employees in Mexico to avoid tax consequences. GT's investigator McGuire's email of February 28, 2006 indicated that the official IOS explanation for the illegal bonuses is: "BLAME CHRIS PEAK!" *See* Ex. BB.

Coopers ("PWC") to review IOS's finances. *See* Ex HH.

In a mid-February 2006 interview with the United States, Kevin Perry corroborated Christine Peak's information about the accrual, confirmed that Lance Furr directed the false statements at Mr. Balsiger's demand, and that Mr. Perry was working at Lance Furr's and Mr. Babler's direction to reduce the accrual's financial shortfall in preparation for revealing it to auditor BKD. Mr. Perry further reported that Mr. Babler said that IOS would falsely tell BKD that the false financial statements were due to errors, not fraud. After the interview, Lance Furr tried to get Kevin Perry to reveal what he had told the United States.

On March 22, 2006, Attorney Richmond told Mr. Babler and PWC that the government was looking into additional allegations of financial fraud. On March 24, 2006, a draft of Mr. Babler's "accrual memo," apparently meant to be a kind of white paper for accounting issues, was circulated to Messrs. Balsiger, Bruce Furr, and some defense lawyers.[11] This draft indicated that Mr. Babler discovered the accrual problem in the last half of 2005; a later draft claimed the accrual was discovered only in February 2006. Drafts also falsely indicated that Mr. Babler believed the accrual problem began with departed employees – (and cooperating witnesses) – Christine Peak and Kari Costello[12] – who then convinced Lance Furr to go along with it.[13] The memo predicted that IOS's auditor BKD would react strongly to news of the accrual.

Also on March 24, 2006, Mr. Bruce Furr faxed his individual lawyer asking if he should

---

[11]Copies of various drafts of "accrual memos" are attached as Exhibit CC.

[12]Harassment of Ms. Costello is alleged as a separate act in furtherance of the obstruction conspiracy. *See* R. 131 at ¶ 53(f); *see also* Ex. H (applying crime-fraud exception to lawsuit against Costello).

[13]No known drafts of Babler's accrual memo state that the company ought to tell the truth.

read the accrual memo.  On March 27, 2006, Mr. Babler informed Bill Clark – who reported to Mr. Balsiger – that the financial restatement needed to be limited to the coupon part of the IOS business to keep it simple.  Also on March 27, 2006, Mr. Babler's accrual memo was transmitted to GT.  On March 30, 2006, Mr. Babler told Kevin Perry to continue working on the restatement, and to follow the company line that the misstatements were mistakes and not fraud.  Mr. Babler told Mr. Perry that financial issues were the only thing keeping the Milwaukee investigation going, and that the restatement would make it go away.

On April 3, 2006, Mr. Babler sent the memo to Attorney Bernard.  GT told Mr. Babler not to issue the draft accrual memo. *See* Ex. CC.  On April 6, 2006, Mr. Babler faxed balance sheets to IOS attorney Richard Munzinger.  On April 7, 2006, GT investigator McGuire informed GT that discussions with Mr. Babler show that revenue source documentation may show some surprises about dates on the end of year invoices.  On April 9, 2006, the IOS board was told of the company's restatement.  The next day, Mr. Babler falsely told BKD that the accrual problem was due to error, not fraud, and repeated that falsehood to IOS's banks.

Over the next several months of 2006, defendants used their lawyers and IOS's attorneys allegedly to:  (1) prevent auditor BKD from learning the truth about the accrual; (2) delay BKD's cooperation with the United States;[14] and (3) prevent IOS part-owner SuperValu from learning

---

[14]On April 3, 2006, BKD told the United States it could not talk to the United States absent IOS's approval.  By May 4, 2006, since no cooperation had been forthcoming, the United States subpoenaed BKD records.  On May 11, 2006, BKD informed the United States it would provide the records and allow its employees to be interviewed without a subpoena.  On June 20, 2006, BKD attorneys sent GT a letter confirming an apparent oral understanding that BKD was authorized to comply with the subpoena for records and provide employees for interview.  By July 6, 2006, IOS attorneys were still working on a reply to the BKD letter of June 20th.  On August 2, 2006, the United States subpoenaed BKD's interviews of IOS employees conducted for the 2005 audit, which were finished August 23, 2006.  On September 8, 2006, GT told the United States IOS may assert a privilege regarding these interviews.  On September 14, 2006,

the truth about IOS billing practices and finances.[15]

During April and May 2006, Mr. Babler's accrual memos were circulated among some attorneys, and attorneys held meetings with auditors PWC and BKD. In June, IOS attorneys and others conferred about the IOS financial restatement, and BKD began conducting interviews of IOS employees as part of its IOS audit for 2005. These interviews continued until late August. Part of BKD's objective for the interviews was to learn the truth about the financial restatement. The United States subpoenaed the interviews on August 2, 2006. A few weeks later, following correspondence between Attorney Bernard and Lance Furr's individual attorney, Lance Furr resigned "for personal reasons" just before BKD was scheduled to interview him on August 23, 2006. Kevin Perry also left IOS before his BKD interview. Mr. Balsiger falsely told BKD the restatement was the work of a departed employee in accounting who failed to report it.

On October 18, 2006, after finishing the IOS 2005 audit, BKD ended its relationship with IOS because of IOS's evident cover up about the restatement, as shown by the sudden resignation of Lance Furr – one of the people most knowledgeable about the restatement – when BKD was about to interview him.

**IV.     Analysis of specific privilege logs.**

---

the United States asked BKD to move to quash the subpoena or provide the interviews; BKD said it awaited IOS approval to comply. The following day, BKD reported that GT approved compliance.

[15]On April 13, 2006, counsel for SuperValu told the United States that GT had found a separate accounting-related issue at IOS, and that SuperValu, though not in the JDA, had two top executives on IOS's board, and needed to find out what IOS had done. SuperValu's attorney said IOS said they were not obstructing SuperValu, and told the audit committee to cooperate, but SuperValu was not in control. On May 4, 2006, SuperValu attorneys told the United States that IOS contended that manufacturers always had notice of the origin of independent store coupons, and that the problem is due to IOS's marketplace competitor NCH. (This was exactly what IOS later contended in its "store tag defense," then under construction).

Because the attorneys for Mr. Currey and Mr. Balsiger have pledged to substantially pare down their privilege logs (and eliminate documents for which they now acknowledge there can be no valid privilege claim), the United States will not waste the Court's time and resources by filing their logs and addressing their individual claims in detail.

However, because these defendants have indicated that they intend to maintain a privilege claim for documents related to the IOS Statement of Invoicing Practices (a/k/a the "white paper"), the United States will analyze Mr. Balsiger's and Mr. Currey's claims with respect to that document and related hard-copy correspondence.

In addition, because the Furr defendants' logs for the Scott Hulse and GT paper documents took a far more restrained approach (and in some cases even were accompanied by redacted versions of the allegedly privileged documents), the United States will address those logs in detail. The United States also will analyze the Furr defendants' October 2, 2007, privilege log for Scott Hulse e-mail. However, the United States will not address the Furrs' claims with respect to GT's electronic documents, as the Furrs simply adopted the logs submitted by Mr. Balsiger and Mr. Currey, who have agreed that those logs are overly broad.

### A. Currey/Balsiger claims regarding the IOS Statement of Invoicing Practices.

Mr. Currey and Mr. Balsiger have stated that they intend to assert privilege for the IOS Statement of Invoicing Practices (the "white paper"). As discussed above, this was the written version of the false store tag defense outlined in Count 27 of the Superseding Indictment. Based on the original logs, the United States believes that hard-copy versions of this document and related exhibits and correspondence have the following Bates numbers:

     **Scott Hulse**                                   SH-D 003003-003053

| SH-C 007879-008415 | **GT Documents** |
|---|---|
| SH-E 000147-000617 | 102493-102536 |
| SH-E 000654-000659 | 103350-133401 |
| SH-F 000001-000573 | 114216-114263 |
| SH-F 002574-002616 | 122462-122518 |
| SH-F 002777-002781 | 122612-122668 |
| SH-F 2911 | 146994-147041 |
| | 167495-167600 |
| | 171349, 171357 |
| | 171470, 171478 |
| | 188519-188566 |
| | 188915-188962 |

Mr. Balsiger and Mr. Currey cannot meet their burden of maintaining a privilege claim for these documents. This is so for four reasons. First, any alleged confidential communications in this document were made on behalf of IOS, which has waived privilege. *See Bevill*, 805 F.2d at 121-25. Second, and more importantly, the memo was a "white paper," the content of which was intentionally disclosed to the United States on January 10, 2007 (and later disclosed to third parties in subsequent filings before Judge Adelman and in the letter to the Deputy Attorney General). Information that is intentionally disclosed cannot be the subject of an ongoing "joint defense" privilege claim by Mr. Balsiger and Mr. Currey. *See Burden-Meeks,* 319 F.3d at 897; *Powers*, 890 F.2d at 1359; *Lawless*, 709 F.2d at 487; *accord Fort James*, 412 F.3d at 1349. Third, even if its content had not been disclosed in January 2007, the United States had recovered a copy of this memo and related exhibits from Lance Furr's office during the execution of a search warrant on May 23, 2006. *See* Ex. S. Although IOS initially claimed privilege, that assertion was withdrawn and, in contrast to other documents from the search, this document was not the subject of a later privilege claim by any individual. As such, any privilege claim for this document or and its content was waived. *See Burden-Meeks,* 319 F.3d at 897.

Fourth, even if Mr. Balsiger and Mr. Currey could establish that the memo was

privileged and not waived, the crime-fraud exception would apply. As the Superseding Indictment explains, the whole point of this document – like all other attempts to develop and support the store tag defense – was to provide false information that IOS's attorneys then would unwittingly present to the United States to attempt to avoid indictment. As such, there is sufficient reason to conclude that this document – which was based on false statements made by and at the direction of Mr. Balsiger, Mr. Currey, Ovidio Enriquez, David Howard, and others – was designed to further an ongoing crime or fraud. Accordingly, the Court should reject any privilege claims with respect to these documents. *See Zolin*, 491 U.S. at 562-63; *Al-Shahin*, 474 F.3d at 946; *Davis*, 1 F.3d at 610.

> **B.     Analysis of the Furr defendants' claims regarding GT paper files sent to the United States.**

On December 27, 2007, the Furr defendants jointly submitted an updated privilege log for documents located in 42 boxes sent to the United States Attorney's Office by GT in mid-2007. This log, which references only 8 documents, is attached as Exhibit E.

> **1.     Document 1 (Bates 114210-15).**

This 6-page document is an "undated" timeline with unknown authors. The Furrs claim that the document is covered by the joint-defense, attorney-client, and work product privileges. The basis for the claim appears to be that Lance Furr's attorneys (Stettler & Duffy) and IOS's attorneys at GT received this document and may have discussed it with the joint defense group. *See* Ex. E.

There is not sufficient information with respect to this document to evaluate the privilege assertions. First, with respect to joint-defense and attorney-client privilege claims, it is not clear if the party providing confidential information is someone other than IOS, which has waived

privilege. Second, it is not clear if some firm other than GT or Scott Hulse (which each have waived any work-product privilege) *prepared* this time-line. The fact that another member of the joint defense group may have received and discussed the document does not make it privileged.

Although the United States is not in a position to evaluate whether the Furrs can meet their burden of proving their privilege claim with respect to this document, the United States only is interested in this timeline if it relates to IOS's store tag / invoicing practices, accounting issues (i.e., the accrual and BKD restatement of income), the departure of Kari Costello or Chris Peak, and/or IOS's dealings with the Patels or Riya. If the Furrs represent to the Court (or the Court's *in camera* review makes clear) that the timeline does not cover such matters, the United States will not further challenge this privilege assertion.

### 2.  <u>Document 2</u> (Bates 165788-90).

This is a 3-page fax sent on April 5, 2006, by Bill Babler to one of IOS's attorneys at GT and Mr. Babler's personal attorney, James Voyles. The Furrs claim that the document is covered by the joint defense, attorney-client, or work-product privileges. Mr. Babler, who was not party to the joint defense agreement, has not asserted a privilege claim for this document. The log indicates that Mr. Babler drafted a fax cover page and included a memo prepared by Lance Furr's attorneys and "various joint defense counsel." *See* Ex. E.

Given that Mr. Babler's counsel indicated in May 2006 that Mr. Babler was not part of any joint defense, the United States does not believe that this document is privileged. Rather, it seems that this was likely a memo being drafted on IOS's behalf with respect to the disclosure of the alleged accounting fraud and its attempts to restate its earnings. If so, the Furrs cannot

establish that the memo is subject to a valid privilege claim. The memo would have been meant for disclosure to third parties. *See Burden-Meeks,* 319 F.3d at 897; *Powers*, 890 F.2d at 1359; *Lawless*, 709 F.2d at 487; *see also* Ex. CC. In addition, even if originally covered by IOS's privilege, that privilege was waived in May 2007. Also, the United States may have this memo (e.g., from the May 23, 2006 Bloomington search warrant), as it has a series of memos on these issues from the April 3, 2006 through May 2006 time period.

Finally, even if IOS had not affirmatively waived privilege, the crime fraud exception would apply as this memo likely was part of an attempt by IOS and individual defendants to use their attorneys to further their efforts to provide false information regarding its accounting practices to banks, auditors, and the United States.

### 3.  Document 3 (Bates 165846).

This is an April 19, 2006 e-mail from James Richmond at GT to other lawyers for IOS as well as the lawyers for Mr. Balsiger and Lance Furr. Because the Furr defendants graciously provided a redacted copy of this document, the United States is aware that the e-mail forwards correspondence from a third-party (Tim McNamara as the lawyer for BKD) providing discussion topics for a meeting about IOS's disclosure of the accrual and its desire to restate earnings. The redacted text appears to occupy one or two lines. The Furrs claim that the e-mail is subject to the joint defense privilege.

Given that the allegedly privileged information consists of 1 or 2 sentences written by IOS's attorney as he forwarded correspondence from a third party, it does not seem likely that the redacted information is any Furr defendant's confidential information or any Furr attorney's work product. Rather, it would seem that any information being shared was IOS's

communication and that any work product was Attorney Richmond's. As such, the claims have been waived.

### 4. __Document 4__ (Bates 171297, 171299, 171301)

This is a July 11, 2006, e-mail from Attorney Bernard at Scott Hulse to James Richmond and Lance Furr's attorney, Joseph Duffy. The Furrs claim that the e-mail is subject to the joint defense privilege. From the redacted version of the document, the United States is aware that it was printed by Bill Clark (a consultant for IOS) and relates to the BKD interviews.

It is not clear whose confidential information allegedly is being shared with Lance Furr's attorney or that anyone's work product other than Attorney Richmond's was being disclosed. As such, it is not clear that there is a valid privilege assertion for this e-mail. The mere receipt of IOS's information by a codefendant's lawyer does not block IOS's privilege waiver. Finally, it seems likely that the crime-fraud exception would apply even if the document were truly privileged.

### 5. __Document 5__ (Bates 166859)

This is a page from an undated glossary prepared by GT that purports to reflect communications with attorneys for Lance Furr. Based on the redacted version of the document, the United States is unable to tell whether the document reveals confidential information provided by Lance Furr or his attorneys. However, it seems possible that the information was being provided on behalf of IOS, as it appears the document covers business terms. In addition, to the extent the document contains false information (e.g., false descriptions of "alternative invoicing" or "accrual" or other terms relevant to the charged offenses) passed along to deceive defense counsel, the crime fraud exception could apply.

## 6.   Document 6 (Bates 166834-58).

This is a 25-page, undated chart summarizing "who's who" in the case and providing a chronology of selected events in IOS's history between 1961 and September 2005.  The Furrs claim that the document is covered by the joint defense, attorney-client, and work-product privileges.

Although the United States is not in a position to know whether there are entries on these documents that list the Furrs as the source of specific confidential information, the claim appears to be overly broad.  For example, the Furrs have redacted their titles at IOS, their addresses, and the names of their attorneys.  How could such information be privileged?  The fact that a client or another attorney may have relayed a fact does not make it privileged.  *See Upjohn*, 449 U.S. at 395.

Similarly, there are entries on the chronology for which the Furrs appear to have asserted privilege simply because the information came from a September 2005 presentation made on behalf of IOS by Attorney Bernard and James Currey (who was not yet a target).  In that regard, an earlier version of this chronology – for which no privilege was asserted – sheds light on some of the entries for which the Furrs now assert privilege.  For example, one entry redacted by the Furrs relates to March 2003.  In the earlier version disclosed to the United States, a March 2003 entry – attributed to the Bernard/Currey presentation on behalf of IOS – states:

> Food Lion (funded account) requests of Kari Costello an accounting of all Food Lion coupons paid vs. all coupons billed to manufacturer's [sic.] in Food Lion's name.

> According to Jim Currey, such data does not exist; we had to recreate some kind of report, even though we told Food Lion we don't keep this kind of data.

*See* Ex. DD.  Similarly, an entry for January 2004 is redacted.  The earlier version of the

document contains an entry for that period, again attributable to the Bernard/Currey presentation,

stating:

> Pathmark contract with IOS is up for renewal.  Pathmark informs IOS it has
> learned that the coupons IOS bills out in Pathmark's name far exceed Pathmark
> coupon volume.  Pathmark receives subpoena from S. Ingraham asking for an
> accounting of all Pathmark coupons going out vs. revenue coming in from IOS.

*See id.*

The United States does not believe that any of the Furrs could validly assert any sort of

privilege for the above entries, which do not involve their communications or their attorney's

work product.  Rather, the communications were made on behalf of IOS, an entity which has

waived any privilege.  In addition, the content could never be privileged – it simply details

communications IOS had with a third-party (Pathmark).  A similar analysis likely applies with

respect to most, if not all, of the other redacted entries.

## 7.    __Document 7__ **(Bates 167024)**

This appears to be the first page of a 3-page memo (plus multiple attachments) written by

Attorney David Bernard on behalf of IOS regarding a tour of an IOS plant by personnel from

S.C. Johnson of Racine, Wisconsin.  Although the date listed on the Furr privilege log is April

27, 2006, the United States believes that the actual date of the memo was April 21, 2006.  The

basis for the claim is that the memo reflects communications authorized by joint defense counsel.

The Court should reject the Furrs' privilege claim.  First, the United States already has

multiple copies of this memo for which no privilege was asserted by any party, including the

Furrs.  *See* Ex. EE.  As such, any claim of privilege for the memo's contents has been waived.

Second, the only communication from Steve Furr to IOS's attorneys reflected in this memo

merely described his conversations, as an IOS executive, with a third party about an IOS plant tour. The underlying facts are not privileged, and any communication of the facts was covered by IOS's privilege waiver. Third, the memo contains false information presented by Ovi Enriquez and David Howard to IOS's attorneys regarding IOS's store tag practices. This false information brings the memo within the crime fraud exception.

### 8.    Document 8 (Bates 167017-21).

These are 5 charts regarding coupon operations prepared by Steven Furr's counsel, Vince Connelly and Sarah Streicker. Unless these charts contain false information passed to those attorneys regarding IOS's store tag and invoicing practices, the Furrs' privilege claim with respect to these charts likely is appropriate.

### C.    The Furrs' supplemental privilege log for other GT hard-copy documents.

On January 23, 2008, the Furrs submitted a 75-page log for additional GT documents that never had been submitted to the United States and which apparently were only sent to individual defendants in late November 2007. This log is attached as Exhibit F. The majority of documents on the log are dated after March 6, 2007, when the initial indictment was returned. Because the United States is willing to forego litigation of most of the Furrs' privilege claims for post-indictment documents, in the text below, the United States will first address the documents that were created after IOS was indicted.

### 1.    Post-indictment documents.

The IOS indictment was returned on March 6, 2007, and unsealed on March 8, 2007. Most of the documents on the Furrs' supplemental log are dated after those dates. Unless the confidential communications underlying the Furrs' claims of joint defense privilege for these

documents relate to then-ongoing acts of obstruction – such as the lawsuit against Kari Costello or the ongoing presentation of the store tag defense (e.g., in the context of the Scott Hulse subpoena litigation or the DAG letter) – the United States will not challenge the assertions of privilege for any document created after March 6, 2007.[16]

### 2. Pre-indictment and undated documents.

The remaining documents on the Furrs' supplemental privilege log for GT documents either are undated or were created before the indictment. These include documents bearing Bates Nos. 200004, 200034-43, 200046, 200049, 200066, 200068, 200072, 200077, 200108, 200110, 2000113, 200118, 200169, 200467, 200469, 200472, 200474, 200477, 200480-81, 200484, 200487, 200490-92, 200520, 200522, 200600, 200657, 200687, 200692, 200723, 200746, 200750, 200753, 200756, 200758, 200789, 200792-93, 200795-96, 200799, 200801, 200840, 200856, 200860, 200862, 200867-69, 200875, 200881, 200883, 200886, 200888, 200983, 200986, 200988, 201000, 201002, 201011, 201033, 201037, 201126, 201130, 201295, 201300, 201309, 201348, 201352, 201354, 201357, 201359, 201362-63, 201365, 201369, 201374, 201380, 201383,201611, 201628, 201632, 201638, 201642, 201653, 201661, and 201664.

### a. General matters.

Without having seen the above documents, the United States generally is not in a position

---

[16]This is so despite the fact that by May 3, 2007, when IOS formally proposed waiving privilege and cooperating in the investigation of individual defendants, the Furrs no longer could have viewed themselves as sharing a common interest with IOS, its new management, and IOS's counsel. The only caveat is that if any defendant raises an issue that somehow might require an analysis of the negotiation of the IOS Cooperation Agreement or the defendants' ability to review IOS files following that agreement, the United States might seek to litigate privilege claims with respect to post-indictment documents addressing those topics.

to assess whether the Furrs can meet their burden of establishing – on a document by document basis – that any particular document contains confidential communications from a Furr defendant. Although some of the e-mails appear to have been sent to or from the Furrs or their lawyers (and as such are more likely to contain communications from the Furrs), others are simply between IOS's lawyers.

To the extent the e-mails contain communications from the Furrs, some may not have been made in a personal capacity seeking legal advice in the criminal case. At least some of the communications may have been made on behalf of IOS as IOS executives or simply may have relayed information as to dealings with third parties. Nor is it clear that each of these e-mails somehow would reveal work-product prepared by joint defense lawyers other than GT or Scott Hulse. Those issues likely will need to be addressed by the Furrs on a document-by-document basis.

### b. Questionable assertions.

When reviewing the log with the above principles in mind, the United States noticed that it may already have some of these documents and/or that some documents might involve third parties. For example, the first document on the log is a February 9, 2006, e-mail from Attorney Geoffrey Grodner at the MCGB law firm to Attorney Jim Richmond. See Ex. F (Entry for Bates No. 200004). This appears to be the same e-mail that was the subject of litigation in the context of a grand jury subpoena to Attorney Grodner's firm in Case No. 07-Misc.-48 (LSA). After the United States moved to compel production of this e-mail and other documents, IOS withdrew its claim. However, Bruce Furr asserted a common interest privilege to the production of the document. Judge Adelman concluded that the crime-fraud exception applied and ordered the

disclosure of the e-mail.  See Ex. H.

Another example relates to the entries for Bates Nos. 200988.  These entries relate to

e-mails from November 20, 2006.  The United States has multiple copies of e-mails fitting that

description from the initial GT production *See* Ex. FF.  If these are the same e-mails (the

recipients and dates match), not only has there been a waiver, but the e-mails themselves confirm

that there was no underlying confidential communication from any of the Furrs and no reference

to work product of the Furrs' counsel.

### c.    Crime-fraud.

Even if the Furrs establish the elements of privilege for many of these pre-indictment

documents, any documents that involved attempts by IOS and individual defendants to obstruct

justice by attempting to use their lawyers (unwittingly) to further or conceal the acts described in

the superseding indictment, the crime-fraud exception would apply.  *See, e.g., Zolin*, 491 U.S. at

562-63; *Al-Shahin*, 474 F.3d at 946; *Davis*, 1 F.3d at 610.  It seems likely that some of the pre-

indictment documents on the Furrs' supplemental log relate to meetings at which the store tag

defense was discussed or presented.  This is especially the case with the e-mails from Fall 2005.

Others likely relate to the Costello litigation, such as the August 30, 2006, e-mails listed on the

log.  Still others could relate to the then-ongoing attempt to use lawyers to unwittingly help

provide false information to third parties regarding the accrual and IOS's accounting practices

(and to falsely blame cooperating witnesses for those issues).  This seems likely for some of the

e-mails and memos from January and April 2006.

### D.    Analysis of the Furr defendants' claims regarding Scott Hulse paper files.

Unless otherwise noted, the Furrs have asserted that the following documents are

protected by the joint defense privilege.

       **1.**       **Documents listed on Steven Furr log of June 18, 2007 (Ex. C).**

       **a.**       **<u>Document 1</u> (Bates SH-C 002484)**
                 **[Same as #13 on L. Furr log of 6/15/07]**

This is a single page of handwritten notes made by Attorney Bernard on January 20, 2006. If any of the Furrs' confidential information or their attorneys' work product is reflected in the document, those portions of the notes would be subject to a valid privilege claim. However, the log indicates that the notes relate to scheduling a meeting between IOS's attorneys, GT's investigator, and counsel for Lance and Bruce Furr.

Because it is difficult to imagine that scheduling a meeting would disclose client confidences or any attorney's mental impressions, it is not clear that confidential client information is reflected in the notes. In addition, to the extent the meeting related to the alleged attempts by IOS and individual defendants to retaliate against Kari Costello or related to other alleged acts of obstruction in which lawyers unwittingly were used, the notes could fall within the crime fraud exception.

       **b.**       **<u>Documents 2 & 3</u> (Bates SH-C 005498, SH-C 00531-88)**
                 **[Encompasses #10 & # 11 on L. Furr log of 6/15/07]**

Documents 2 and 3 on Steven Furr's log for Scott Hulse's hard copy documents relate to 2006 legals bills. Document 2 is a file folder for 2006 legal bills for individual defendants, and Document 3 is an analysis of legal fees for individual defendants.

As a general matter, legal bills are privileged only to the extent they contain detailed billing descriptions that divulge confidential communications or work product. However, regardless of whether these items are truly privileged, the United States is only interested in

these documents if they memorialize or corroborate attempts by the defendants to use attorneys (unwittingly) in furtherance of the obstruction conspiracy. Unless the legal bills show attempts by the clients to further or conceal the store tag defense, the IOS Statement of Invoicing Practices, plant tours or meetings at which the store tag defense was presented, discussions with individuals or lawyers who were not part of the joint defense, the accrual/accounting issues, attempts to retaliate against Christine Peak or Kari Costello, or other alleged acts of obstruction, the United States will not contest any privilege assertions for legal bills.

### c.     Document 4 (SH-B 001962-70).

This is an October 20, 2005, memorandum prepared by a Scott Hulse associate for Attorney Bernard. Based on the log, the memo analyzes "the joint defense agreement."

This memo appears to be Scott Hulse's work product. Because that firm waived any work-product protection, unless the memo discusses a confidential communication by a Furr defendant or references specific work-product prepared by the Furr defendants' lawyers, this document could not be subject to a valid privilege claim.

### d.     Documents 5, 6, 7 (SH-B 001279, 001264, 001266).
    [Same as #6, #7, #8 on L. Furr log of 6/15/07]

These documents are handwritten notes made by David Bernard during teleconferences with Lance Furr's attorney, Joseph Duffy, on June 20, 2006, August 18, 2006, and August 21, 2006. To the extent portions of the notes reveal Lance Furr's confidential information or Attorney Duffy's mental impressions, they could be subject to a valid claim of privilege.

However, based on the dates, the teleconferences may have related to attempts by BKD to interview Lance Furr and/or his resignation from IOS. As such, the United States requests that these notes – especially those from August – be reviewed to see if they contain information

intended to be disclosed to third parties, such as the purported reasons for Lance Furr's departure.

Similarly, to the extent the notes show any ongoing attempt by Lance Furr to use his attorneys (unwittingly) to further or conceal criminal activity as alleged in Count 27, the crime fraud exception could apply. This seems likely given that given that Lance Furr caused IOS, other defendants, and others to provide false information to BKD (and ultimately the United States) about his resignation. That is, Mr. Furr claimed to have resigned for personal reasons. However, multiple witnesses have reported that Lance Furr simply moved to a different building and that they would bring him IOS-related work at the off-site locations.[17]

### e. <u>Document 8</u> (SH-B 001157) [Same as #4 on L. Furr log of 6/15/07]

This is a June 12, 2006, e-mail from Attorney Bernard to other attorneys, including counsel for Lance Furr and Mr. Balsiger. The e-mail relates to the BKD restatement.

Like many of the documents described above, the content of this e-mail will determine whether: (1) the document is privileged because it reveals an individual defendant's confidence; and (2) whether any privilege has been lost because the e-mail furthered the charged obstructive acts relating to the accrual, accounting fraud, and BKD restatement.

### f. <u>Document 9</u> (SH-B 001155-56) [Same as #3 on L. Furr log of 6/15/07]

This is a June 13, 2006, letter from one IOS attorney (Bernard) to another (Richmond). Although the log describes the document as requesting information *from* Joseph Duffy, that description could be an error. The United States already has at least two copies of a June 13,

---

[17]One of these individuals also has reported that Lance Furr had him take IOS documents home and hide them in that individual's basement.

2006 letter from Attorney Bernard to Attorney Richmond for which no privilege was claimed. That letter relates to IOS corporate information requested *by* Attorney Duffy regarding the accrual and audit matters. *See, e.g.,* Ex. GG. If these are the same document, any privilege has been waived – as neither the Furrs nor anyone else claimed privilege for that document. In addition, the content of the letter does not reveal any Furr defendants' communications or in any way disclose Attorney Duffy's mental impressions. If anything, the document leads to questions about the parameters of the joint defense, as IOS's attorneys were evaluating whether IOS's information should be disclosed to counsel for Lance Furr.

### g. Document 10 (SH-B 002356-60).

Like Document 8 on the Furrs' "UPDATED log for Greenberg Traurig documents" (Bates 167017-21), these are 5 charts regarding coupon operations prepared by Steve Furr's counsel, Vince Connelly and Sarah Streicker. Unless these charts contain false information regarding IOS's historical store tag and invoicing practices, the Furrs' privilege claim with respect to these charts likely is appropriate.

### h. Documents 11 & 12 (SH-C 003009-47, 00368-413).

These are a letter and memorandum regarding an IOS plant tour by Racine-based employees of S.C. Johnson. It appears that these documents already are in the possession of the United States and have been analyzed above in the context of GT Document 7 (Bates 167024); *see also* Ex. EE.

### 2. Documents listed on Lance Furr log of June 15, 2007.

Lance Furr's privilege log of June 15, 2007 lists 17 documents. *See* Ex. B. Eight of these documents (3, 4, 6, 7, 8, 10, 11, 13) already have been analyzed in Section IV.D.1 above.

As a result, this section addresses the remaining documents.

### a.      Documents 1, 2  (SH-B 00295-96)

These documents are 2 related e-mails from June 15, 2006.  One was sent from Attorney Abigail Clapp at GT to David Bernard.  The other was sent by David Bernard to a legal secretary at the Scott Hulse firm.  Both relate to a request by Lance Furr's attorney for information.

Given the date and purported subject, these e-mails likely relate to Attorney Duffy's June 13, 2006, request for IOS corporate information regarding the accrual and audit matters (discussed above in the context of Document 9 on Steven Furr's log).  If so, these e-mails might simply discuss whether and/or when to send IOS's information to Attorney Duffy.  Such e-mails would not reveal any Furr defendant's confidential communications to counsel or disclose Attorney Duffy's mental impressions.

### b.      Documents 5, 9, 14, 15 & 17 (SH-B 001275, 001301; SH-C 002532, 002539, 009117).

These documents are handwritten notes made by David Bernard during the following teleconferences, all of which purport to refer to earlier conversations with Lance Furr or his counsel:

- October 16, 2006 call with Attorney Richmond (Document 5);
- April 17, 2006 call with Bill Babler (Document 9);
- October 2005 [date unknown] call with Attorney Richmond (Document 14);
- October 25, 2005 call with Attorney Richmond (Document 15); and
- September 26, 2005 call with Attorneys Richmond & Clapp (Document 17).

To the extent the notes reveal Lance Furr's confidential information or Attorney Duffy's mental impressions (and not simply describe communications with third parties, etc.), those portions of the notes would be subject to a valid claim of privilege.  However, based on the

dates, the United States believes that the crime-fraud exception likely applies to some of these notes. For example, the April 17, 2006, call with Bill Babler likely relates to IOS's attempts to use attorneys (unwittingly) to create a false explanation (including falsely blaming Chris Peak and Kari Costello) for its fraudulent accounting practices for disclosure to BKD, banks, and ultimately the United States.

Similarly, the log entry for October 25, 2005, indicates that the call related to "a Lance Furr conversation." The United States believes that this refers to a conversation Lance Furr had with a third-party – Kevin Perry, an IOS employee who never was part of the joint defense after he began cooperating in February 2006. The conversation related to alleged attempts by Lance Furr to get Mr. Perry to falsely blame Chris Peak for all of the wrongdoing at IOS – the very type of conduct described in the charged obstruction conspiracy. *See* Ex. AA.

### c. **Document 12 (SH-C 000698-733).**

This is a September 26, 2005, e-mail sent by GT (Attorney Finger) to lawyers for individual targets as well as lawyers for IOS employees who did not agree to join the defense agreement (e.g., Attorney Mary Stillinger). Based on other logs, it appears that this e-mail included a draft joint defense agreement that never was signed. It is not clear whether this e-mail and attachments reveal any individual client confidences or discloses the work-product of any of the Furrs' attorneys. To the extent this e-mail simply encompasses GT's work product and/or IOS's communications, any protection was waived.

### d. **Document 16 (SH-C 009934-35)**

This is an October 5, 2005 fax from Joseph Duffy to Attorney Richmond. Unless the fax relates to one of the charged acts of obstruction, the asserted claim may be valid.

### E. Analysis of the Furr defendants' claims regarding Scott Hulse electronic documents.

On October 2, 2007, the Furrs submitted a Furr joint log for IOS's electronic records at the Scott Hulse firm. *See* Exs. D-1, D-2. Although the log is lengthy (216 pages), the log is not as daunting as it appears. First, much of the length is attributable to the fact that the Furrs took the time and care to separately list each e-mail in lengthy strings of e-mail correspondence. As a result, as the Furrs have indicated that the log actually encompasses only approximately 440 documents out of 8,500 electronic documents at Scott Hulse. In addition, well over half of the listed entries are for e-mails that took place after March 6, 2007, the date of the original indictment. As explained below, to avoid needless litigation, the United States will not oppose the Furrs' privilege assertions with respect to the vast majority of post-indictment e-mails.

### 1. Pre-indictment documents (Ex. D-1).

#### a. General discussion.

The first 85 pages of this privilege log covers electronic documents (generally e-mails and attachments) generated between September 19, 2005, and March 5, 2007. For the reasons discussed above in connection with the Furrs' supplemental log for GT documents, the United States generally is not in a position to assess whether the Furrs can meet their burden of establishing – on a document by document basis – that any particular e-mail contains confidential communications from a Furr defendant seeking advice in a personal (non-corporate) capacity or otherwise contains work-product prepared by joint defense lawyers other than GT or Scott Hulse. As a result, those issues likely will need to be addressed by the Furrs on a document-by-document basis.

#### b. Examples of questionable assertions.

When reviewing this log, the United States noticed that it may already have some of these documents and/or that some e-mails involve third parties. Here are a number of examples:

On page 10, there are entries for January 5, 2006, e-mails to and from individuals at Price Waterhouse Coopers (PWC). *See, e.g.,* Entries for SH-EDOC0007169-70 & SH-EDOC0007671-72. The United States has multiple copies of a document from the GT production which matches that description and for which no privilege was claimed. Nor is it clear why such e-mails would not be covered by the waivers of IOS and GT. In that regard, PWC appears to have been retained by GT on behalf of IOS to assist in the defense of the corporate defendant. The retainer agreement states as much, and Attorney Richmond represented to others with whom PWC wanted to speak that only IOS could waive privilege for PWC's work. *See* Ex. HH; *see also* Ex. K at Bates Nos. 148941, 175424. Because the United States has never seen the purported joint defense agreement (or other correspondence on the subject), the government is not aware of any contrary factual information that would suggest that PWC was employed by or working for the joint defense group as a whole. At least some documents suggest that GT did not automatically share the work product of its subcontractors (like PWC and Jim McGuire) with counsel for the Furrs. *See* Ex. K at Bates No. 148929 (Attorney Richmond stating that Kevin Perry's information would not be immediately disclosed to Lance Furr); *see also* Ex. GG.

On page 17, there are entries for an April 21, 2006, e-mail from Steven Furr regarding dealings with a customer. *See* Entry for SH-EDOC0009615-22. The claim is that the communication was "authorized by joint defense counsel." When an individual communicates on a business matter as a corporate executive, any privilege belongs to the corporation. This is

51

so even if an individual's attorney "authorized" disclosure. In any event, it seems likely that this could relate to an April 18, 2006, plant tour by S.C. Johnson representatives, a follow-up memo dated April 21, 2006, and additional e-mails by Steven Furr on April 21, 2006. *See* Ex. EE.

On page 19, there is a listing for an April 18, 2006, e-mail from Tim McNamara, the outside lawyer for BKD. *See* Entry for SH-EDOC0009678-94. This individual is a third-party for privilege analysis, and the United States already has copies of this e-mail – possibly including a copy sent by the Furrs to the United States as part of their privilege claim for a GT document bearing Bates No. 165846.

On page 26, there are numerous entries for e-mails and attached letters between June 12, 2006, and June 21, 2006. (There also is a reference to a June 15, 2007 letter but that date appears to be a typo). These e-mails appear to be the same or similar to Documents 1, 2 & 4 on Lance Furr's June 15, 2007 log for Scott Hulse paper documents (Bates Nos. SH-B 00295-96 & SH-B001157). Given the date and purported subject, these e-mails may relate to Attorney Duffy's June 13, 2006, request for IOS corporate information regarding the accrual and audit matters (discussed above in the context of Document 9 on Steven Furr's June 18, 2007 log). If so, these e-mails might simply discuss whether and/or when to send IOS's information to Attorney Duffy. Such e-mails would not reveal any Furr defendant's confidential communications to counsel or disclose Attorney Duffy's mental impressions.

On pages 65 through 69, there are numerous entries for e-mails related to IOS's work in complying with a grand jury subpoena. The United States believes that it has many of these e-mails from GT documents for which no privilege was claimed. These e-mails appear to have been relating to work done on behalf of IOS and did not involve confidential communications by

52

individuals in their personal capacity for legal advice as part of the joint defense.

### c.     May 23, 2006-related entries

Pages 20 through 26 of the log contain entries for May 23, 2006, that likely relate to the execution of a search warrant at IOS on that date.  If the Furrs can verify that these e-mails do not contain references to any specific topics referenced in the obstruction conspiracy, the United States will not contest these privilege claims.  Similarly, IOS and the United States litigated issues regarding this search and the use of a taint team.  These issues prevented the United States from accessing any of the search materials – even those for which no privilege was asserted – until after IOS was indicted.  The United States does not intend to contest any privilege claims relating to those types of legal issues or disputes.

### d.     Crime-fraud issues.

Even if the Furrs can establish the elements of privilege for many of these pre-indictment documents, any documents that involved attempts by IOS and individual defendants to obstruct justice by attempting to use their lawyers (unwittingly) to further or the acts described in the superseding indictment, the crime-fraud exception would apply.  *See, e.g., Zolin*, 491 U.S. at 562-63; *Al-Shahin*, 474 F.3d at 946; *Davis*, 1 F.3d at 610.

Given the number of meetings, presentations, and plant tours during which IOS and individuals sought to present the false store tag defense and false invoicing information to attorneys as part of an attempt to have the attorneys use that information to attempt to avoid an indictment, it would seem that many e-mails on those topics would fall within the crime-fraud exception.  These e-mails likely would be concentrated in September and November 2005; January, March, and April 2006, and January 2007, but could have occurred at any time.

Other likely areas of crime-fraud application include e-mails leading up to and following the January 10, 2007, presentation to the United States. Other store-tag related e-mails likely involve litigation of a December 2006 subpoena to the Scott Hulse firm. In filings between January and April 2007, and at an April 12, 2007, hearing related to that litigation, IOS and its attorneys relied on the false store tag defense. Similarly, IOS and GT relied on the defense in a letter sent to the Deputy Attorney General, asking him to overrule the decision to indict IOS. Based on the GT production, it seems that e-mails were exchanged regarding this letter between February 26 and March 8, 2007.

Similarly, given the widespread attempts to use legal counsel to conceal the true nature of the accrual or obstruct justice by providing false information regarding IOS's accounting practices, e-mails on those issues likewise would seem to fall within the crime-fraud exception. These e-mails likely are concentrated in October through December 2005 and again in January, March, April, June, July, and August 2006. They would reference the accrual, the BKD restatement, Lance Furr's purported resignation, and the other accounting-related conduct described in Count 27.

Finally, other e-mails likely relate to the Kari Costello litigation. Those e-mails likely are concentrated in January, February, and August 2006.

## 2.	Post-indictment documents (Ex. D-2).

Pages 86 through 216 of this log relate to post-indictment documents. As discussed above in the context of other privilege logs, unless the confidential communications underlying the Furrs' claims of joint defense privilege for particular documents relate to then-ongoing acts of obstruction, the United States will not challenge the current assertions of privilege for

documents created after March 6, 2007.

**V.    Conclusion.**

For the reasons set forth above, the United States opposes the defendants' current

privilege claims.

Dated at Milwaukee, Wisconsin, this 3rd day of March, 2008.

STEVEN M. BISKUPIC
United States Attorney

By:

s/Richard G. Frohling
Assistant United States Attorney
Bar Number: 1021952
E-Mail: richard.frohling@usdoj.gov

s/Stephen A. Ingraham
Assistant United States Attorney
Wisconsin Bar Number 1009890
E-Mail:  stephen.ingraham@usdoj.gov

s/Kelly B. Watzka
Assistant United States Attorney
Wisconsin Bar Number 1023186
E-Mail: kelly.watzka@usdoj.gov

Attorneys for Plaintiff
Office of the United States Attorney
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin 53202
Telephone:  (414) 297-1700
Fax: (414) 297-1738

## Index to Exhibits

| Exhibit | Description |
|---------|-------------|
| A | List of "who's who" in case |
| B | Lance Furr log for paper documents (dated 6/15/07) |
| C | Steven Furr log for paper documents (dated 6/18/07) |
| D-1 | Furr joint log for Scott Hulse electronic records pages 1-85 (dated 10/2/07) |
| D-2 | Furr joint log for Scott Hulse electronic records pages 86-216 (dated 10/2/07) |
| E | Furr Defendants' "UPDATED Privilege Log re: Greenberg Traurig Documents Provided to Government" (dated 12/27/07) |
| F | Furr Defendants' Supplemental Privilege Log got GT documents (dated 1/23/08) |
| G | FBI 302 re: Ovidio Enriquez proffer (dated 4/25/07) |
| H | Redacted September 19, 2007 Order in Case No. 07-Misc.-48 (LSA) |
| I | FBI 302 re: interview of Nereo Castillo (dated 5/31/07) |
| J | Letter to James McGuire from James Richmond re: IOS - Federal Investigation (dated 8/18/05) |
| K | James T. McGuire Memorandum re: Kevin Perry (dated 4/26/06) |
| L | FBI 302 re: David Howard proffer (dated 4/12-13/07) |
| M | FBI 302 re: interview of Ronald Ederer (dated 6/22/07) |
| N | FBI 302 re: interview of William Lee Clark (dated 11/20/07) |
| O | US v. IOS Hot Docs Index Excerpt (dates 6/21/05-10/18/06) |
| P | Email to Jane McCullough from Kevin Finger (dated 12/9/05) |
| Q | Letter to AUSA Steve Ingraham from Atty Dean Strang re:IOS (dated 2/29/08) |
| R | Letter to David Bernard from William Clark re: IOS (dated 10/2/06) |

| S | IOS should not be Indicted for Mail/Wire Fraud |
|---|---|
| T | Employee Time Billing Report for Currey Adkins (dated 4/26/07) |
| U | Invoice - Bill to Kimberly-Clark Corporation - Remit to IOS (dated 3/29/06) |
| V | FBI 302 re: Powerpoint presentation from Kevin Finger and James Richmond (dated 1/10/07) |
| W | FBI 302 re: Kevin Finger proffer (dated 6/27/07) |
| X | Email to cpeak, kperry & mmartin@iosnet.com from bbabler@iosnet.com (dated 1/28/05) |
| Y | Note re: Per TCB for all divisions November needs to be 5-week month |
| Z | Email to Bill Clark from Kevin Perry (dated 9/7/05) |
| AA | Memorandum to File: 63718.010300 from Abigail Clapp re: 10/25/05 teleconference with David Hensel and Linda Pence regarding interview of Kevin Perry (dated 10/25/05) |
| BB | Email to James Richmond from James McGuire re: IOS (dated 2/28/06) |
| CC | Accrual memos (March/April 2006) |
| DD | Chart on Chronology starting 1961-September 2005 (063718-166093) |
| EE | Letter with attached memorandum to James Richmond and Kevin Finger from W. David Bernard re: S.C. Johnson Plant Tour (dated 4/21/06) |
| FF | Emails to Kevin Finger from Bill Babler re: Subpoena (dated 11/20/06) |
| GG | Letter to James Richmond and Kevin Finger from W. David Bernard re: Audit Matters (dated 6/13/06) |
| HH | Email to James Richmond from Abigail Clapp re: PwC Engagement Letter with attachment (dated 1/6/06) |