UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

      v.                                Case No. 07-CR-57

THOMAS C. BALSIGER,
JAMES CURREY,

          Defendants.

## DECISION REGARDING AFFIRMANCE OF BILLS OF PARTICULARS DECISION AND DENIAL OF MOTIONS TO DISMISS

      Thomas C. Balsiger and James Currey filed three motions for bills of particulars. Magistrate Judge Patricia J. Gorence denied those motions and both defendants appealed. Balsiger and Currey also filed motions to dismiss for violation of their Fifth and Sixth Amendment rights, and Magistrate Judge Gorence recommended that those motions be denied. Balsiger and Currey object to the recommendation.

### BILLS OF PARTICULARS

      Magistrate Judge Gorence denied three motions for bills of particulars. In the first (Doc. 567), Balsiger and Currey moved jointly for a bill of particulars regarding counts 1 through 25 of the Superseding Indictment, which charge them with wire fraud. The second motion (Doc. 571), also brought by Balsiger and Currey, sought a bill of particulars regarding several parts of paragraphs 52 and 53 in count 27 of the Superseding Indictment. The third (Doc. 570), filed by Currey alone, sought additional detail regarding which factual allegations in the Superseding Indictment pertain to him.

A magistrate judge has authority to decide a nondispositive motion such as one for a bill of particulars, *see* 28 U.S.C. § 636(b)(1)(A); Fed. R. Crim. P. 59(a), although a party may appeal, Fed. R. Crim. P. 59(a); *see* § 636(b)(1)(A). The court may set aside the magistrate judge's determination, or any portion of it, if a defendant shows that the order is contrary to law or clearly erroneous. § 636(b)(1)(A); Fed. R. Crim. P. 59(a).[1] The clear error standard means that the court can overturn the magistrate judge's ruling only if it is "left with the definite and firm conviction that a mistake has been made." *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 943 (7th Cir. 1997).[2]

Balsiger and Currey do not object to Magistrate Judge Gorence's recitation of applicable law. Instead, they object to the application of that law to this case. The court will not repeat the applicable law and will adopt the description set forth in the magistrate judge's order.

Counts 1 to 25 charge the defendants with wire fraud in violation of 18 U.S.C. § 1343 based on the fraudulent submission of coupons to manufacturers for reimbursement. Balsiger and Currey contend that they need to know (1) which coupons were allegedly fraudulent, (2) the amount of allegedly fraudulent coupons included in the fifteen faxed invoices and ten wire transfers that form the basis of these counts, and (3) the

---

[1]As noted by the government and Magistrate Judge Gorence, a decision denying a bill of particulars generally is not overturned without a showing of an abuse of discretion. (Doc. 594 at 8.) However, an appeal from a magistrate judge's decision is reviewed for clear error. Balsiger and Currey argue the clear error standard. This court need not delve into exactly which standard of review applies. Under either, the magistrate judge's decision may be affirmed.

[2]The court notes that on appeal of these motions, all parties have consistently incorporated by reference their prior briefs. (*See, e.g.*, Docs. 599 at 2, 611 at 3, 612 at 4.) While a de novo review requires the court to review all prior briefs, an appeal from a magistrate judge's order should not. Portions of the magistrate judge's order not appealed stand. The court prefers that an appeal narrow the issues for review, not incorporate everything that has been argued before. Nevertheless, it reviewed all prior briefs because of the parties' incorporation here.

amount International Outsourcing Services LLC (IOS) was paid for the allegedly fraudulent coupons.[3]

Balsiger and Currey contend that they must be able to identify and quantify the allegedly fraudulent coupons to prepare their defense and have been unable to do so from the information in the Superseding Indictment or the discovery provided by the government pursuant to its open-file policy. They contend that without specific details regarding the fraudulent coupons they are searching for a "needle in a haystack" of voluminous discovery and are risking double jeopardy. According to defendants, the fifteen invoices and ten wire transfers identified in counts 1 to 25 total over $25,000,000, and they cannot prepare their defenses unless the coupons the government contends are fraudulent are identified before trial. (Doc. 567 at 3.) Defendants maintain they need to be able to locate the physical coupons at issue or the invoices IOS submitted to the manufacturers' agents to prepare their defenses. (*See, e.g.*, Doc. 567 at 4, 6.)

After due consideration of these arguments, the court concludes that the superseding indictment sufficiently apprises these defendants of the charges against them and that the magistrate judge did not commit clear error in denying the motion.

The government and magistrate judge noted, and Balsiger and Currey do not dispute on appeal, that their concerns regarding double jeopardy respecting the subject of this case no longer provide a basis for a bill of particulars, as the statute of limitations has run.

_____

[3]In their motion Balsiger and Currey also asked for an explanation of how the United States calculated the $15 million alleged to have been wrongfully obtained from manufacturers located in the Eastern District of Wisconsin. (Doc. 567 at 2.) The United States provided an explanation in its response brief and Balsiger and Currey have not sought any further explanation in subsequent briefs.

The superseding indictment provides substantial detail for counts 1 to 25. Each count charges a separate execution of a wire fraud scheme with identification of the specific manufacturer, the specific merchants, coupons identified by product or offer code, specific invoice or wired payment, and date. Exactly how many fraudulent coupons were associated with any given execution of the scheme or exactly how much payment was made from fraudulent redemption does not affect materiality.

Defendants say they need identification of the *IOS* invoices relating to the charged wire-fraud counts. The superseding indictment references only invoices submitted by manufacturer agents to the manufacturers, not the IOS invoices to the agents. Defendants say that identification of these latter invoices is critical to their defenses. However, the court disagrees inasmuch as it finds that the superseding indictment provides sufficient information such that defendants should be able to search for such IOS invoices (if they exist) in the discovery.

The request for identification of the actual physical coupons at issue involves evidentiary matters. Defendants contend that the government's statement that the physical coupons were typically destroyed is incorrect because it appears that out-of-area coupons are retained per standard industry practice. (Doc. 588 at 3.) Defendants contend that without the physical coupons they have no way of verifying or disputing whether the coupons ever existed or were redeemed out of area. (*Id.* at 3-4.) However, this argument highlights the evidentiary nature of defendants' requests. Whether the physical coupons existed or were redeemed out of area are evidentiary matters, not charging matters. The indictment sufficiently apprises the defendants of the charges against them.

4

Moreover, the defendants' argument regarding the need for specific identification of each fraudulent coupon is unpersuasive. The scheme involved the mixing of substantial amounts of fraudulent coupons with legitimately redeemed coupons. The superseding indictment alleges that the defendants wrongfully obtained more than $15,000,000 from Eastern District of Wisconsin manufacturers alone and $250,000,000 from manufacturers nationwide. Identification of specific fraudulent coupons is not the focus, but rather fraudulent coupons in bulk. Further, much identification is possible from the superseding indictment. For instance, the superseding indictment alleges that CVS did not carry Sargento products. Therefore, the defendants can reasonably and easily infer that every coupon supposedly redeemed at a CVS store for a Sargento product was fraudulent and all money demanded by each invoice was wrongly claimed. Other coupons alleged to have been distributed in the northeast part of the United States but redeemed in the south are identified by offer codes, allowing identification.

Defendants submit that the fact that CVS did not carry Sargento products does not mean Sargento coupons were not used by a consumer—the coupons may have been misredeemed—so identification of coupons at issue is critical. (Doc. 588 at 4.) Similarly, that a coupon was redeemed "out of area" does not mean it was fraudulently redeemed, as customers travel and coupons may mistakenly have been distributed in the wrong region by coupon printers. (Doc. 588 at 6-7.) But these are arguments for the jury and matters of evidence, not matters about sufficiency of the indictment. A defendant has the constitutional right to know the offense with which he is charged, but not the details of how it will be proved. *United States v. Fassnacht,* 332 F.3d 440, 446 (7th Cir. 2003).

Magistrate Judge Gorence based her denial of this motion, in part, on the government following its "open-file" policy and belief that the discovery, though voluminous, is in a searchable format. (Doc. 594 at 9.) On appeal, defendants contend that the government's representation that much of the discovery is in searchable form (allowing defendants to pinpoint relevant materials) (*see* Doc. 578 at 4) was not accurate, and they provide an affidavit in support. According to defendants, the discovery is at most only thirty-percent searchable. (Doc. 608 at 1.)

This affidavit was not presented to Magistrate Judge Gorence with the defendants' reply brief (*see* Doc. 588), and new evidence is improper on appeal.[4] Additionally, these search limitations were not raised with the magistrate judge even though the government discussed searchability in its brief responding to this motion. Moreover, the government indicates its willingness to work with defendants regarding search-related issues. (*See* Doc. 608 at 2). And the volume of discovery does not necessarily require a bill of particulars. Also, in response to another motion for bill of particulars, the government indicated that it repeatedly offered to provide Currey's and Balsiger's attorneys with a thorough presentation of the case against them, but they declined.

The court has reviewed *United States v. Wen*, No. 04-CR-241, 2005 U.S. Dist. LEXIS 19531 (E.D. Wis. Aug. 17, 2005) (Goodstein, M.J.), as cited by defendants. In that case Magistrate Judge Aaron E. Goodstein found that a bill of particulars was required; the government had to identify certain parts by their export control classification numbers so that Wen could identify them. In his reasoning, Magistrate Judge Goodstein noted the

---

[4] Balsiger and Currey provided the same affidavit with the objection to each of the denied motions for bills of particulars. (*See* Docs. 598, Ex. A, 599, Ex. A.) The affidavit is rejected as to each objection.

unusual volume of discovery, which created a risk that Wen would not be able to link the parts specified in the indictment to the right discovery. *Id.* at *23-*24. While this case, too, involves substantial discovery, Magistrate Judge Gorence considered *Wen* and was not persuaded that more specific information regarding the coupons at issue was required here. This court sees no clear error in that decision. The parts in *Wen* were confusingly identified, whereas here the superseding indictment provides some identification of fraudulent coupons, with offer codes and certain products and certain retailers.

The court notes that in response to the motion regarding counts 1 to 25, and ostensibly to resolve possible confusion about the coupon reimbursement process, the United States asked certain language be stricken from the superseding indictment. (*See* Doc. 578 at 12-13.) However, the magistrate judge did not find any confusion and did not strike any language. Again, the court sees no clear error in that decision.

Balsiger and Currey's second motion seeks particulars regarding count 27 of the Superseding Indictment, specifically the allegations in paragraphs 52 and 53. Count 27 charges Balsiger, Currey, and five other named defendants with conspiracy to obstruct justice. According to Balsiger and Currey, "[m]any allegations in Count Twenty-Seven contain extremely vague descriptions of the parties involved, the time at which the acts were to have occurred, and the specific actions involved. Other allegations fail to allege a specific action taken or performed by the accused parties." (Doc. 571 at 4.) These defendants contend that the allegations fail to sufficiently apprise them of the charges against them, in particular failing to allege the time and place of their alleged criminal conduct and using terms such as "others" or "other information" that are not specific enough. (*Id.* at 4-5.) Balsiger and Currey claim that they need "notice as to who, what,

7

where, and when is being alleged" in particular paragraphs of the indictment. (Doc. 590 at 5.)

The court has reviewed the parties' submissions and Magistrate Judge Gorence's order and finds no clear error. The references to "others" in paragraphs 52 and 53 do not render the allegations vague; the defendants should be able to tell from the allegations what the charges against them are. For instance, the allegation that between June 22, 2005, and June 28, 2005, Balsiger and Currey "and others" caused materially false information regarding IOS's relationship with Riya to be submitted to federal law enforcement conducting the grand jury investigation (Doc. 131, ¶ 53.g.) is sufficiently clear such that Balsiger and Currey can defend without a bill of particulars as to who the "others" may be. Similarly, the allegation that on August 18, 2005, Balsiger, in the presence of "other IOS defendants," presented false information regarding IOS's coupon invoicing to one of IOS's attorneys (Doc. 131, ¶ 53.j.) is sufficiently clear.

Balsiger and Currey contend that the information they seek are the "who, what, when, and how" specifics of the allegations in count 27. But paragraph 53 of the Superseding Indictment sets forth many of those details—various subparagraphs contain dates when alleged acts occurred, and the others specify date ranges, most of which are limited.

Again, as with the first motion, the government's open file policy provides the defendants with evidence to help them understand the charges and case against them. The "others" may be determined from the evidence. Further, as noted above, the government represents, and Balsiger and Currey do not dispute, that prosecutors have provided a standing offer of an in-person presentation regarding its view of the case.

8

Moreover, in response to the objections of these defendants, the government has offered to cure any search limitations problems as soon as the defendants provided a format preference. (Doc. 607 at 4.)

Additionally, as with the first motion, the court rejects the late-submitted affidavit regarding search problems. Double-jeopardy issues no longer exist. And the court is not persuaded by *Wen*'s reference to voluminous discovery and defendants' claim that without relief they must search for a needle in a haystack, that a bill of particulars should be issued. The magistrate judge's denial will be affirmed.

In his separate motion, Currey seeks particulars regarding the charges against him. He contends that he is mentioned only once in the first thirty factual allegation paragraphs (in paragraph 28.d.) and seven times within paragraph 52 and that "without specific knowledge as to which factual allegations pertain to Currey, other that the above mentioned paragraphs, he cannot know which allegations pertain to him." (Doc. 570 at 2-3.) Currey contends that the Superseding Indictment fails to clearly identify those charged with specific acts (*id.* at 5), and he seeks confirmation of whether he is included in numerous references to terms such as "the defendants," "employees," "others," "individual defendants," and "the IOS defendants" (*id.* at 7-8). His motion lists forty-one requests for a "yes" or "no" answer regarding whether he is included in such references in the Superseding Indictment. (*Id.* at 7-9.)

The court sees no clear error in the magistrate judge's conclusion that the Superseding Indictment apprises Currey of the nature of the charges against him to enable them to prepare a defense. (*See* Doc. 594 at 10.) Notwithstanding Currey's representation that he is not mentioned until paragraph 28 of the Superseding Indictment,

that is not the case. Paragraph 1 charges each defendant by name and calls them together "the defendants herein." Currey is also named in paragraph 3.k. with eight other of the named defendants under the heading "the IOS defendants." These paragraphs indicate that at least as to counts one through twenty-five (paragraphs 1 through 45), Currey is among the "defendants" and "IOS defendants." Thus, Currey sees vagueness where it does not exist.[5]

Moreover, as noted by Magistrate Judge Gorence, the information sought by these defendants goes beyond the bounds of information for a bill of particulars and the government has provided its open file of discovery, obviating the need for a bill. Again, as with the first motion, the court rejects the late-submitted affidavit regarding search problems.

As stated above, double-jeopardy issues no longer exist. The court remains unpersuaded by *Wen*'s reference to voluminous discovery and a pointless search for a needle in a haystack as support for issuance of a bill of particulars. The magistrate judge's denial will be affirmed.

---

[5]The court notes that in affirming the magistrate judge's denials, the court has not accepted the government's suggestion that because of his position at IOS Balsiger should know what he is charged with. (*See* Doc. 581 at 6-7.) In responding to the second and third motions for bills of particulars, the government argued that of all those associated with this case, Balsiger

> clearly knows the most of any person about all of its many aspects. All the discovery points to his intimate involvement in IOS operations over many years and the active role he took in seeking to defend the company when the investigation was under way. Knowledgeable witnesses are unanimous in ascribing to him primary responsibility for what happened at IOS in business operations, as well as the company's strategy in dealing with the investigation. . . . This undoubted position as the most knowledgeable person makes his claim to need more enlightenment from the prosecution about the meaning of certain things in Count 27 of the superseding indictment, involving the conspiracy to obstruct justice a bit disingenuous.

(Doc. 581 at 6-7.) What the evidence shows Balsiger to have known or done is outside the matter of whether the indictment sufficiently informs the defendants of the charges against them.

MOTIONS TO SUPPRESS AND REQUESTS FOR EVIDENTIARY HEARING

Balsiger and Currey filed a motion to dismiss the Superseding Indictment, arguing that their Fifth and Sixth Amendment rights were violated. Although they filed separate motions to dismiss, they raise similar arguments and in many respects their briefs are identical.[6] Both requested a two-day evidentiary hearing to obtain evidence for the motions to dismiss. The motions are based predominantly on IOS's termination of payment of Balsiger's and Currey's attorney's fees following IOS's negotiated resolution of charges against it.[7]

A magistrate judge cannot decide motions to dismiss but instead proposes findings and makes recommendations. § 636(b)(1)(A), (B); Fed. R. Crim. P. 59(b)(1). A district court must review de novo a magistrate judge's recommendations to which a party timely objects. 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(2), (3). The district court reviews for clear error portions of a recommendation to which no party objects. *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999).

Magistrate Judge Gorence set forth the applicable law regarding the defendants' Fifth and Sixth Amendment motions, including a detailed summary of *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) ("*Stein III*"). Neither defendant objected to the magistrate judge's summary of applicable law; instead, they object to her proposed findings and her application of the law to this case. The court adopts the summary of applicable

_____

[6]The court notes that Balsiger and Currey both attempt to incorporate by reference entire briefs and exhibits of the Furr defendants regarding the Furrs' prior motions to dismiss based on Fifth and Sixth Amendment concerns. (Docs. 568 at 11, 569 at 11, 600 at 12; Doc. 602 at 17.) This court rejects these attempts at incorporation. Incorporating whole briefs of other defendants regarding separate motions goes beyond the reasonable page limits for each motion presently under consideration.

[7]Balsiger and Currey state that IOS did not pay the legal expenses they incurred after IOS entered into its Cooperation Agreement with the government. (Doc. 568, Ex. E, ¶ 5; Doc. 569, Ex. E, ¶ 5.)

law from the recommendation and will not repeat it except as necessary for purposes of discussion.

In *Stein III*, the Second Circuit affirmed dismissal of an indictment due to a Sixth Amendment violation of the defendants' right to counsel. *Stein III* followed two pertinent district court opinions, *United States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006) ("*Stein I*"), and *United States v. Stein*, 495 F. Supp. 2d 390 (S.D.N.Y. 2007) ("*Stein II*"), in which the court held that actions by prosecutors had violated not only the defendants' Sixth Amendment rights but the defendants' Fifth Amendment rights as well, requiring dismissal of all charges. (Because the Second Circuit affirmed the Sixth Amendment finding, it did not address the Fifth Amendment holding. *Stein III*, 541 F.3d at 136.) Balsiger and Currey liken the events that occurred in the present case to those in the *Stein* case and argue that this case, too, should be dismissed because of Fifth and Sixth Amendment violations.

However, key facts render the two cases distinguishable. The dismissals in *Stein* resulted from a combination of what was termed the "Thompson Memorandum" and multiple instances of prosecutorial conduct that caused the defendants' employer, KPMG, to condition, cap, and terminate payment of the defendants' defense fees. *See Stein III*, 541 F.3d at 141, 144; *Stein I,* 435 F. Supp. 2d at 352-53. But the facts of this case show that neither of those factors exists to an extent anywhere close to the situation in *Stein*.

First, the Thompson Memorandum was not in effect when the Indictment and Superseding Indictment issued in this case, when IOS negotiated with prosecutors for dismissal of charges against it, and when IOS capped or terminated payment of Balsiger's and Currey's defense costs. As discussed in *Stein III* and the magistrate judge's recommendation here, the Thompson Memorandum required that prosecutors consider

12

a company's payment of employees' attorney's fees when weighing the extent and value of the company's cooperation in a criminal matter. *See Stein III*, 541 F.2d at 136. The Thompson Memorandum was binding on all federal prosecutors. *Stein I*, 435 F. Supp. 2d at 338. The district court opinion in *Stein I* pointed to the all-inclusive language of the Thompson Memorandum as problematic under that court's Fifth Amendment analysis:

> [T]he Thompson Memorandum does not say that payment of legal fees may cut in favor of indictment *only if* it is used as a means to obstruct an investigation. Indeed, the text strongly suggests that advancement of defenses [sic] costs weighs against an organization independent of whether there is any "circling of the wagons."
> . . . . Few if any competent defense lawyers advise a corporate client at risk of indictment that it should feel free to advance legal fees to individuals in the face of the language of the Thompson Memorandum itself. . . .
> . . . . If the government means to take the payment of legal fees into account in making charging decisions only where the payments are part of an obstruction scheme—and thereby narrowly tailor its means to its ends—it would be easy enough to say so. But that is not what the Thompson Memorandum says.

*Stein I*, 435 F. Supp. 2d at 363-64.

In December 2006, *before* the original indictment issued in this case and *before* prosecutors and IOS began talks about resolving charges against the company, the Department of Justice (DOJ) replaced the Thompson Memorandum with the "McNulty Memorandum," under which prosecutors were to consider a company's fee advancement policy only where circumstances suggested that such payments were intended to impede a criminal investigation and the deputy attorney general approved. *See id.* at 136-37. (*See also* Docs. 568 at 4 n.1, 569 at 4 n.1, 600 at 6 n.1, 602 at 8 n.1.) Thus, the McNulty Memorandum revised the language found problematic in *Stein I* to greatly limit the

instances in which prosecutors were to consider payment of an employee's defense fees when dealing with a company under investigation or indictment.

Although Balsiger and Currey point to the pressure they believe was exerted on IOS by the Thompson Memorandum regarding payment of the defendants' attorneys' fees, that memorandum had been replaced, and cannot reasonably be considered by this court as having any such effect. The first factor relied upon by the *Stein* cases, i.e., the pressure of the Thompson Memorandum, no longer existed at the time of the facts of this case.

Here, nothing indicates that the conditions required in the McNulty Memorandum (in place at the time of pertinent events in this case) were satisfied or that prosecutors believed they were. Regardless, Balsiger and Currey contend that the McNulty Memorandum did not cure the shortcomings of the Thompson Memorandum because prosecutors could still consider the advancement of attorney's fees, though in rare cases. (Doc. 600 at 9 n.2; Doc. 602 at 12 n.2.) But these defendants refrain from arguing that this is one of those rare cases.

Balsiger and Currey contend that the Thompson Memorandum still had some influence because it was in effect in August 2005 when the government informed IOS by letter that IOS was under investigation. The government's letter solicited IOS's cooperation in uncovering facts about suspected fraud and said that the government "in accordance with standard DOJ policy concerning such matters, will give due consideration in the resolution of this matter to IOS's cooperation, voluntary disclosure, payment of restitution, and remedial efforts." (Doc. 568, Ex. A at 1.) As this court has already indicated respecting a similar motion from the Furr defendants, evidence linking the "standard DOJ policy" language in the August 2005 letter and the Thompson Memorandum is weak. (Doc.

347 at 8 n.1.)  The aforementioned letter referenced cooperation, voluntary disclosure, payment of restitution, and remedial effort—not termination of defense-cost payments. Moreover, IOS offered and continued to pay its employees' legal fees after that letter (Doc. 458, Ex. E, ¶ 3), indicating that any possible implied reference to the Thompson Memorandum did not cause any reaction by IOS regarding those legal fees.  By the time IOS decided to discontinue payment of Balsiger's attorney's fees and to cap Currey's attorney's fees (with a ceiling of $75,000 per month for all employees combined), the McNulty Memorandum had replaced the Thompson Memorandum, addressing concerns raised in the *Stein* cases.  Hence, there is no credible evidence that the Thompson Memorandum exerted any influence thereafter on the prosecutors in this case.

Second, on the record before the court, the prosecutors' conduct here was vastly different from that found violative in *Stein*.  When the *Stein* prosecutors prepared for a meeting with KPMG's attorney they placed high on their list of questions whether KPMG was advancing legal fees to employees under investigation.  *Stein III*, 541 F.3d at 137.  At the meeting one Assistant United States Attorney (AUSA) inquired about the firm's plans for paying fees and about any legal obligation to do so, while another AUSA added that the Thompson Memorandum was "'a point that had to be considered.'"  *Id.*  The AUSAs then asked KPMG's attorney to ascertain KPMG's legal obligations to advance the fees.  *Id.* KPMG was given the impression that paying employees' legal fees would be considered a lack of cooperation.  *See id.* at 136-37.

Subsequently, the AUSAs worked jointly with KPMG to use the payment of legal fees as pressure on employees.  The AUSAs encouraged KPMG to condition payment of defense fees on the employees' cooperation with the government.  KPMG told employees

that it would advance legal fees only if they talked with the government, chose not to invoke the Fifth Amendment, and were not indicted. *See id.* at 137. The *Stein* prosecutors went so far as to suggest KPMG tell employees to be "'totally open'" with prosecutors even if it meant that the employees incriminated themselves, and prosecutors dictated language advising employees that they could speak with government agents without counsel. *Id.* at 138. Prosecutors thereafter reported to KPMG when employees did not cooperate, resulting in termination of the employees' defense payments and, sometimes, their employment. *Id.* at 138-39.

The *Stein* district court found that absent pressure from the government through the Thompson Memorandum and the prosecutors' inquiries and statements, KPMG would have paid the defendants' legal fees and expenses without regard to cost. As held by the Second Circuit, the government's "overwhelming influence" caused KPMG to condition payment of fees on an employee's cooperation with the government, to cap fees for each employee, and to terminate payment of fees if the employee was indicted. *Stein III*, 541 F.3d at 136. The significant encouragement and influence of the prosecutors was so strong that it turned KPMG's revised fee policy into state action. *See id.* at 147-48.

Here, prosecutors did not expressly reference the Thompson or McNulty Memoranda. They did not ask IOS whether the company was paying its employees' attorney's fees. Moreover, nothing in the record suggests that prosecutors took the payment of such fees into account. Balsiger and Currey point to an agent's question, when IOS's new CEO Greg Rayburn and IOS's attorney, Michael Fitzgerald, met with a prosecution team on April 24, 2007, following indictment, regarding whether the company was still paying the defendants. (*See* Doc. 568, Ex. F at 1, 7.) But payment of salaries or

compensation does not equate with payment of defense costs. Further, the question followed statements by Rayburn about the company's financial peril. Importantly, by the time of that meeting, IOS had already replaced Balsiger with Rayburn and had reduced the indicted principals' pay by half. With charges against the company, IOS had already brought in a new management team; nothing suggests that had prosecutors exerted pressure on IOS regarding that decision. Pressure may have accompanied the indictment itself, but it did not come from the prosecutors here.

Other than the possible vague, implied inclusion of the Thompson Memorandum in the words "standard DOJ policy" mentioned in the prosecutors' August 2005 letter, nothing suggests that the government considered the Thompson Memorandum's content in dealing with IOS. The Thompson Memorandum was never referenced by prosecutors as was the case in *Stein*; nor did prosecutors mention the McNulty Memorandum instead. IOS's attorneys found out about the Thompson Memorandum from other IOS attorneys, not the government. (Doc. 568, Ex. B, ¶ 3.) And per a board member's recollection, Balsiger read from the McNulty Memorandum at an IOS board meeting on April 11, 2007.[8] (Doc. 568, Ex. J at 2.) Neither of these references to the memoranda came from the government or

---

[8]Balsiger and Currey present as "minutes" from the April 26, 2007 IOS board meeting (*see* Doc. 568 at 7, 569 at 7, 587 at 4-5) what Magistrate Judge Gorence has found to be merely a *draft* of the minutes. Magistrate Judge Gorence noted that the final meeting minutes contain significant differences from the draft. The defendants contend that "[t]he final minutes do not negate the evidentiary value of the preliminary minutes." (Docs. 600 at 16, 602 at 24.) However, while the evidentiary value may not be fully "negated," the evidentiary value of draft minutes is far less than that of final, board-approved minutes. The draft is the recollection of the secretary or drafter, while the final minutes are the collective and official recollection of the board and organization. Henry M. Robert, *Robert's Rules of Order* § 40, at 349 (9th ed. 1990) ("[T]he minutes do not become *the* minutes and assume their essential status as the official record of the proceedings of the society until they have been approved; and before this happens, the secretary's draft may be materially modified in the correction process."); Alice Sturgis, Standard Code of Parliamentary Procedure 190 ((3d ed. 1988) ("Before the assembly has approved the minutes, they are merely the secretary's record. When the minutes have been approved, and the secretary has certified them . . . they become the *official* minutes of the organization.").

establish that the government was exerting influence on IOS to end payment of the employees' attorneys' fees.

Some of the evidence cited by Balsiger and Currey in support of their objections points to the *lack* of government interference. As noted just above, IOS and its attorneys found out about the memoranda from sources other than prosecutors. At the meeting between Rayburn, Fitzgerald and prosecutors regarding the indictment against IOS, prosecutors started with a series of questions about the roles of the indicted defendants with the company, not about the company's financial arrangements for paying defense costs (as the *Stein* prosecutors had discussed). (Doc. 568, Ex. F at 2.) The government's letter of May 4, 2007, listing requirements for a resolution of charges against IOS, does not mandate termination of payment of employees' attorney's fees. (Doc. 568, Ex. L.) Nor does the draft Cooperation Agreement mention termination of such payments. (Doc. 568, Ex. M.)

Following the August 2005 letter, even though IOS knew it was being investigated and its attorneys knew of the Thompson Memorandum, the company offered to pay employees' legal fees. Additionally, the draft minutes referenced by these defendants indicates that the IOS board *approved* continuing to pay employees' legal fees up to $75,000 per month "subject to a determination by Greenburg [sic] Traurig that the indemnification was . . . not inconsistent with the discussions held with the AUSA." (Doc. 568, Ex. I at 3.) Regardless, Balsiger and Currey argue that this last phrase regarding discussions with the AUSA suggests that prosecutors signaled payment of attorney's fees was a concern. But it is hard to believe that had Rayburn and Fitzgerald inferred from their communications with prosecutors that payment of legal fees would be considered a lack

of cooperation that Rayburn would thereafter ask the IOS board to approve continued payment of such fees for most employees.

Balsiger and Currey argue that for IOS to demonstrate its cooperation with the government, it "was forced to stop paying [Balsiger's] attorney's fees and capped the payment of [Currey's] attorney's fees contrary to IOS's historical practice." (Doc. 600 at 11; *see* Doc. 602 at 16.) However, unlike the facts in *Stein*, the present facts simply fail to show any such "force." Although KPMG and IOS had a past practice of advancing legal fees for employees facing legal investigations, *see Stein III*, 541 F.3d at 140, the evidence here shows no pressure even close to that of the prosecutors in *Stein*. In no way can this court say that but for the Thompson Memorandum (or the McNulty Memorandum) and the prosecutors' conduct, IOS would have continued to pay all of Balsiger's and Currey's legal expenses without consideration of cost.

Balsiger and Currey add that "[t]o make matters worse," the government "coerced IOS into waiving its attorney-client and work product privileges which, in and of itself, increased the individual defendants' legal expenses exponentially." (Docs. 568 at 3, 569 at 3, 600 at 4, 602 at 6.) The court has already rejected the argument that IOS was coerced into waiving its privileges. (Docs. 408, 440.)

Balsiger contends that in addition to the matter of defense fees, the government has unconstitutionally hampered his ability to defend this case by causing IOS to terminate his employment and to freeze any distribution of funds upon sale of the company. Similarly, Currey submits that the government caused IOS to terminate his employment or contractor arrangement with IOS. According to these defendants, the imposition of economic

punishment by prosecutors before any finding of guilt is not legitimate. (Docs. 568 at 2-3, 569 at 3.)

However, the evidence shows that even before Rayburn and Fitzgerald met with the United States to discuss dismissal of charges against the company, Balsiger (a principal or owner) had resigned from his CEO position, and Rayburn told the government that he intended to move the lower-level defendants out of the coupon business. (Doc. 568, Ex. F at 2.) Rayburn had cut IOS's senior employees' compensation by fifty percent. (Doc. 568, Ex. F at 7.[9]) Rayburn told prosecutors IOS could not continue to pay those employees at that rate much longer and pressed the financial straits of the company as a basis for dismissal of the charges. (*See* Doc. 568, Ex. F at 3-5 (indicating Rayburn told government that cash flow projections were dismal, a bank was owed $94 million, and without dismissal of the indictment the company would likely file for bankruptcy protection within ninety days), 7.) Rayburn's objective was to save the company. (Doc. 568, Ex. F at 3.) Further, minutes from an IOS board meeting held April 26, 2007, indicate that a financial analysis team hired by a bank group were concerned that indicted individuals were still on the company payroll. (Doc. 568, Ex. I at 1.)

Currey points to a letter sent on August 30, 2007, from one of the prosecutors to IOS's counsel, expressing concern that various defendants who had been removed from the company were still managing to exert influence. The letter expressly mentioned Currey's control over IOS's IT functions and suggested that Currey's role "provides a

_____

[9]Balsiger states that after IOS was indicted his employment was terminated and his salary was discontinued, but he does not state whether that occurred immediately upon indictment or how long afterward. (*See* Doc. 568, Ex. E, ¶ 4.) Thus, it is unclear whether after his resignation Balsiger was still paid fifty percent of his salary and, if so, for how long. Currey says that after IOS was indicted he was removed from all of his roles in the IOS Data Services Operation, but he does not state whether he continued to receive any salary or held other roles. (*See* Doc. 569, Ex. E.)

potential channel for Balsiger to continue to exert influence." (Doc. 569, Ex. O at 2.) Currey contends that this was a veiled demand for IOS to cease business with Currey and his firm. However, Currey's position is mentioned just once in a lengthy discussion of the government's concern about whether indicted individuals were still running IOS notwithstanding Rayburn's representation that they had been removed from control. The government indicated in the letter that removal of indicted principals was "foundational" to the government's negotiations regarding dismissal of charges against IOS. (Doc. 569, Ex. O at 3.) Nothing suggests that the government sought Currey's termination to interfere with his ability to defend the case; instead, it sought to address concerns about whether Rayburn was actually still in charge and what influence Balsiger and the Furrs still had on operations.

In short, except for one question by a member of the prosecution team about whether the company continued to pay indicted employees and a prosecutor's inquiry about Currey's and Balsiger's continued involvement, both of which occurred *after* many defendants had been removed from their positions and their pay had been at least halved, the evidence points to financial reasons, not government influence, for IOS's decision. And those questions by prosecutors, unlike the question about payment of defense fees asked in *Stein*, did not necessarily relate to illegitimate concerns. Rayburn was claiming financial harm imposed on IOS by the indictment, and the government presumably was concerned with whether the individual defendants exerted control over a company with which prosecutors were negotiating or had negotiated resolution of charges. Hence, this court finds that the evidence does not support any finding that the government coerced IOS into

terminating the employment of these defendants thereby undercutting their ability to defend themselves in this case.

As for the freeze on distributions, Balsiger's evidence indicates that the idea came from IOS's attorneys at Greenberg Traurig, not prosecutors. (Doc. 568, Ex. H.) Attorney James Richmond corresponded with Rayburn by email the day after Rayburn met with prosecutors (i.e., April 25, 2007), and suggested talking points for the next meeting, including IOS's holding of distributions and cooperation with the government, likely to include waiver of the attorney-client privilege. (Doc. 568, Ex. H.) Nothing suggests that the government raised this idea first.

Currey has two more points. He contends that the government has interfered with his ability to fund his defense by filing lis pendens against his property. (*See* Doc. 602 at 14.) However, the Superseding Indictment contains a forfeiture provision. And pretrial restraint on property to preserve it for forfeiture does not violate the Fifth Amendment or Sixth Amendment, even if the assets would otherwise be used to pay a defendant's legal fees. *See United States v. Monsanto*, 491 U.S. 600, 614-16 (1989); *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 619, 626, 632-33 (1989). "The Sixth Amendment does not prevent the government from reclaiming its property from a defendant even though the defendant had planned to fund his legal defense with it." *Stein III*, 541 F.3d at 155 (discussing *Caplin & Drysdale*).

Finally, Currey contends that the government has impermissibly interfered with his ability to fund his defense by canceling his and his company's ability to obtain government contracts. (*See* Doc. 602 at 14-15.) On the other hand, nothing in the record suggests that prosecutors had anything to do with the cancelation of Currey's eligibility for government

22

contracts. The prosecutors state (as officers of the court) that they had no knowledge of the suspension of Currey's firm before it occurred. And the letters of suspension indicate that Currey and his firms were suspended because of Currey's alleged actions and criminal indictment. (Doc. 569, Ex. Q at 3, 4', 3", 3'".) Nothing in the letters suggests that any information or pressure came from prosecutors.

As a final point, the court notes the lack of support for any finding that IOS's capping or termination of attorney fee payments interfered with Balsiger's and Currey's defenses in any way. The defendants swear that after IOS stopped paying their attorneys' fees they switched attorneys, but noticeably absent is any statement that they changed attorneys because they could not pay the fees that IOS had previously paid. The defendants argue that they were "forced" to find new criminal defense counsel (*see* Docs. 568 at 9, 569 at 8), but they do not say that a lack of financial resources forced them to do so. Neither defendant's affidavit includes a sworn statement stating that he altered his defense because of a lack of funds or that he has not defended the case as they desired. Contrarily, they have litigated this case aggressively. These facts contrast with those of some *Stein* defendants, who gave up Fifth Amendment rights against self-incrimination or adjusted how vigorously they defended that case because of KPMG's fee-payment policy.

This court refrains from determining whether the defendants need to show prejudice, i.e., that their defenses have differed to their detriment from the lack of attorneys' fee payments from IOS. *See Stein III*, 541 F.3d at 151 ("[T]he Sixth Amendment violation is complete irrespective of the quality of the representation they receive." (internal quotation marks omitted)), 157 (stating that the right at stake is the right to counsel of choice and no

23

additional showing of prejudice is required).  Instead, this court is merely cognizant that evidence of prosecutors' interference with the defense of this case is lacking.

For the aforementioned reasons, and on the record before the court, the motions to dismiss for violation of Fifth and Sixth Amendment rights must be denied.  Balsiger and Currey have not been denied a fair proceeding and the government has not interfered with their right to counsel as they claim.  Dismissal of an indictment is a remedy of last resort, appropriate only where necessary to address a constitutional error that cannot be otherwise remedied.  *See Stein III*, 541 F.3d at 144.  Here, such a constitutional violation does not exist and dismissal is not warranted.  "It [was] not the mere request and receipt of cooperation that the *Stein* court found objectionable, but the totality of the circumstances in that case, including finding that the government's unjustified conduct barred certain defendants from retaining counsel of their choice and deteriorated the ability of the defendants to be represented as they choose [sic]."  (Doc. 347 at 8.)  The present circumstances do not approach those of *Stein*.

That leaves the issue of whether the present record is sufficient for deciding these motions.  As stated above, the defendants lose their motions on the present record.  But Balsiger and Currey requested an evidentiary hearing at which they anticipated uncovering evidence to support their motions.  Magistrate Judge Gorence denied the request for an evidentiary hearing, and this court reviews that decision deferentially for clear error.  *See* 28 U.S.C. § 636(b)(1).  Balsiger and Currey argue that the magistrate judge failed to hold an evidentiary hearing and then cited a lack of evidence as a basis for her recommendation to deny the motions to dismiss.  (Doc. 600 at 15; Doc. 602 at 22.)

24

This court finds that no clear error exists. An evidentiary hearing is meant to provide a basis for resolving disputed facts, not unearthing discovery. *See United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007) (stating that "[e]videntiary hearings are not required as a matter of course" and that the court needs to conduct a hearing "when the allegations and moving papers are sufficiently definite, specific, non-conjectural and detailed enough to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion" (internal quotation marks omitted)). Balsiger and Currey failed to provide any basis for believing there were disputed facts to be resolved; instead, they speculated that facts supporting their argument might exist.

The defendants contend that they need an evidentiary hearing to determine whether the government, "through the Thompson Memorandum, McNulty Memorandum, the conduct of the AUSAs or otherwise (e.g. through written or verbal communications with Greg Rayburn and/or Michael Fitzgerald) affected IOS's determinations" to cap or terminate payment of attorney's fees, waive its privileges, freeze distributions to defendants, terminate defendants' employment or involvement with IOS, and whether the government interfered with Currey's ability to earn an income or afford effective legal counsel. (Docs. 568 at 12, 569 at 12-13, 600 at 13-14, 602 at 18-20.) But unlike the situation in *Stein*, where the government conceded that the lead prosecutor inquired about KPMG's payment of attorney's fees (*see* Doc. 603, Ex. S at 2), no evidence points to the need for such inquiry here. Noticeably absent is any evidence, after years of litigation, suggesting that there is some story the court does not yet know—no suggestion that Rayburn or IOS was pressured by the government to stop paying attorneys' fees, for

instance. And nothing indicates why Balsiger and Currey would not know of such evidence if it existed. Post-indictment, Balsiger was apparently attending portions of board meetings. (Doc. 568, Ex. I at 1, Ex. J at 2.) Balsiger and Currey seem to have had access to draft minutes and emails among board members as well as final versions of board minutes, yet they point to nothing suggesting a factual dispute that required a hearing. They say they would call Rayburn and Fitzgerald as witnesses and seek written communications between them and the government as evidence, yet the company waived its privileges and turned over its files. That there is something new to uncover is conjecture.

Balsiger and Currey argue that genuine issues of fact exist as to whether "standard DOJ policy" as referenced in the August 2005 charging letter was a reference to the Thompson or McNulty Memoranda. (Doc. 609 at 2.) However, the McNulty Memorandum was not in effect at that time, and as stated above, IOS did not terminate payment of defense fees for almost two years after receipt of the charging letter. Moreover, under any reasonable interpretation, "standard DOJ policy" could encompass far more than merely the Thompson Memorandum.

Lastly, Balsiger and Currey contend that they "have set forth significant evidence corroborating their claim that the Government interfered with their constitutional right to counsel and due process of law." (Doc. 600 at 12; Doc. 602 at 18.) However, the evidence already submitted by them has been considered, and these defendants have not pointed to anything specifically known that suggests a factual dispute that warranted an evidentiary hearing. Hence, this court finds that the magistrate judge did not clearly err in denying the requests of defendants Balsiger and Currey for an evidentiary hearing.

CONCLUSION

For the reasons set forth above, this court has affirmed the magistrate judge's decision (Doc. 594) denying the motions for bills of particulars (Docs. 567, 570, 571), adopted the magistrate judge's recommendation (Doc. 594) regarding Balsiger's and Currey's motions to dismiss, and denied those motions to dismiss (Docs. 568, 569).

Dated at Milwaukee, Wisconsin, this 2nd day of September, 2015.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE