**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** : | |
| : | **Case No. 07-CR-00057** |
| **Plaintiff,** : | |
| : | |
| **v.** : | |
| **THOMAS C. BALSIGER,** : | |
| : | |
| **Defendant.** : | |

## MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Defendant Thomas C. Balsiger moves the Court for an order reducing the imprisonment portion of his sentence to time served, with or without a period of home confinement, based on the "extraordinary and compelling reasons" discussed below and pursuant to the newly amended 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Balsiger's continued confinement in federal prison places him in grave danger of exposure to COVID-19, to which his advanced age and medical history leave him acutely vulnerable.

### INTRODUCTION

Thomas C. Balsiger, 67, is incarcerated at FCI La Tuna, in Anthony, Texas, serving ten years in prison for coupon fraud charges. His date of release is currently projected as October 11th 2025, but he could be subject to release 2 ½ years sooner based on the First Step Act elderly pilot program. However, federal prisons are experiencing a widespread outbreak of COVID-19, with more than 6,000 inmates and staff already having tested positive. *See* https://www.bop.gov/coronavirus/. And, as the Court knows, prisoners are at greater risk of

1

contracting the virus simply due to the heightened level of exposure inherent in the nature and standard conditions of incarceration.

COVID-19 is not always deadly, but it can be and is much more often for older inmates like Mr. Balsiger, who has a history of myocardial infarction (heart attack), and suffers from hypertension, angina, and coronary artery disease (atherosclerosis). At FCI La Tuna, where Mr. Balsiger is incarcerated, a staff member tested positive for COVID-19 and three have recovered from it, *see id.*, highlighting the imminent risk of contracting the disease. Many federal courts around the country have granted motions for compassionate release during the COVID-19 crisis to inmates who are far less at risk than Mr. Balsiger. Mr. Balsiger made a compassionate release request (which was denied) to FCI La Tuna's warden more than 30 days ago, so the Court can decide this motion under 18 U.S.C. § 3582(c)(1)(A). Mr. Balsiger requests that the Court reduce his prison sentence to time served, with or without home confinement.

## **FACTUAL BACKGROUND**

**A.      Thomas Balsiger's Coupon Fraud Conviction and Sentence.**

On December 5, 2016, Thomas Balsiger was found guilty of 10 counts of wire fraud under 18 U.S.C. § 1343, one count of wire fraud conspiracy under 18 U.S.C. §§ 1343 and 1349, and one count of conspiring to obstruct justice under 18 U.S.C. §§ 371 and 1503(a). ECF No. 885.

Mr. Balsiger was the Chief Executive Officer of International Outsourcing Services, LLC (IOS), a multi-national coupon clearinghouse with over 8,000 employees worldwide. Among other services, IOS operated the Rapid Pay Program, which primarily serviced smaller retailers. Using the Rapid Pay Program, Mr. Balsiger fraudulently invoiced manufacturers for both legitimate as well as illegitimate coupons. Mr. Balsiger was also convicted of obstruction of justice for lying to law enforcement, coaching witnesses, and encouraging others to lie to law enforcement. ECF No. 131.

2

Nonetheless, the sentencing submissions also displayed Balsiger's generous and compassionate traits, by which he is widely known. Balsiger Sentencing Mem., ECF No. 973. First, Mr. Balsiger is a pillar of his El Paso community. When former El Paso mayor, Raymond Caballero, wished to found El Paso's first medical school, Balsiger reached out and offered needed business leadership and fresh ideas. Today, the Paul L. Foster medical school, the first to be established in four decades, boasts large laboratories and state-of-the-art facilities. Mr. Balsiger also founded a tennis program aimed at underprivileged youth. Besides simply introducing them to the joy of the game, the El Paso Youth Tennis Center made it possible for many low-income young men and women to attend college with tennis scholarships. *Id.* at 10.

Mr. Balsiger mentored young people near and around his home, including U.S. Representative and presidential candidate Beto O'Rourke, and Air Force Captain Steve Rene Ramirez. *See id*. at 6-7. When Nader Safa, a Lebanese citizen, first arrived in the U.S., he was refused work because of his religion and ethnicity. Mr. Safa, an aerospace engineer, wrote that Mr. Balsiger "constantly remind[ed] people of the issues we still have in America and encourage[d] me to always embrace my ethnicity and heritage to ensure that America can be the great nation that we continue to dream of – a nation of all." *Id.* at 6-7.

Mr. Balsiger is a proud father and grandfather above all else. His son Joe wrote, "I can only attribute my success in life, as well as my heart-felt obligation to give back to others, to the parenting I have received my entire life." *Id.* at 5. His three daughters have likewise expressed how dedicated their father has always been to their upbringing. His daughter Angela wrote, "To this day, I remain baffled by my father's ability to attend every ballet recital, piano recital, talent show, tennis match, soccer game, softball game, basketball game, rodeo, Christmas pageant, and

3

graduation (including kindergarten), while somehow building a business that offered thousands of workers a job." *Id.* at 5-6.

On March 6, 2017, Mr. Balsiger was sentenced to ten years in prison to be followed by three years' supervised release. ECF No. 995. Mr. Balsiger was also ordered to pay over $65 million in restitution. ECF No. 994. Although Mr. Balsiger's official release date is October 11, 2025, under the First Step Act elderly pilot program he could be set for release to home confinement as soon as 2 ½ years from now.[1]

### B. Mr. Balsiger's Compassionate Release Request on April 29, 2020.

On April 29, 2020, Balsiger's daughter, Angela Caldwell, submitted a request for compassionate release to the warden of FCI La Tuna on behalf of her father. *Caldwell Request to FCI La Tuna Warden*, April 29, 2020, attached as Exhibit A.[2] In her request, Ms. Caldwell noted: (1) her father is of advanced age; and (2) he suffers from serious chronic medical conditions including a history of coronary artery disease and hypertension, both of which leave him more susceptible to death from COVID-19. *See id.* Nearly eight weeks and well more than thirty days have elapsed since Ms. Caldwell's request on April 29, 2020.

### C. Mr. Balsiger's Compassionate Release Request is Denied.

---

[1] Mr. Balsiger appears to qualify for the elderly pilot program as he is over 60 and his crime was not one of violence or a sex offense. *See* Home Confinement Under the First Step Act (FSA), BOP Memorandum, available at: https://www.bop.gov/policy/om/001-2019.pdf, citing 34 U.S.C. § 60541(g). Eligible inmates complete their sentences in home confinement after serving two- thirds of their term. *Id.* Two-thirds of Mr. Balsiger's 120-month sentence is 80 months. Mr. Balsiger began his sentence in April 2017, so he has served 38 months, leaving 42 months before FSA home confinement eligibility. However, factoring in time deducted for good conduct (GCT), he would reach two-thirds in approximately two and a half years.

[2] A family member can make a compassionate release request on behalf of an inmate. 28 C.F.R § 571.61(b) ("The Bureau of Prisons processes a request made by another person on behalf of an inmate in the same manner as an inmate's request.").

4

The warden at FCI La Tuna handed Mr. Balsiger an undated letter on May 19, 2020, denying his compassionate release request. *Compassionate Release Denial Letter*, attached as Exhibit B.

The warden's letter is a relic of the past and does not conform with this Court's interpretation of § 3582(c)(1)(A). In the letter, the warden quotes the "BOP Program Statement 5050.50," https://www.bop.gov/policy/progstat/5050_050_EN.pdf, which was written before COVID-19 became prevalent and still incorporates pre-First Step Act language.[3] The warden quotes a static list comprised of extremely specific illnesses, ignorant of the nuance this court and others have read into § 3582: "[T]he court in deciding a compassionate release motion is no longer confined to the specific examples enumerated in U.S.S.G. § 1B1.13." *United States v. Scott*, 17-CR-156, 2020 WL 2508894, at *8 (E.D. Wis. May 15, 2020). The denial letter also ignores the interpretation that includes COVID-19 among U.S.S.G. § 1B1.13's "other reasons." *See United States v. Resnick*, 14-CR-810, 2020 WL 1651508, at *7 (S.D.N.Y. Apr. 2, 2020).

In addition, the warden touts the BOP's "extraordinary measures to contain the spread of COVID-19 and treat any affected inmates." While FCI La Tuna has taken measures to stop the spread of COVID-19, *any* exposure may prove fatal to Mr. Balsiger due to his age and underlying medical conditions so even extraordinary measures- if they are being fully and faithfully taken- likely will not prevent the spread to Mr. Balsiger nor eliminate the risk he faces.

---

[3] In pointing out the anomalies arising from the fact that BOP guidelines were instituted prior to the enactment of the First Step Act, many courts have afforded wide latitude in evaluating grounds for compassionate release, in order to remain consistent with what was clearly the legislative intent in drafting the FSA. *See United States v. Nazer,* 18-CR-00783-2, 2020 WL 2197840, at *4 (N.D. Ill. May 6, 2020) (listing cases).

Unfortunately, FCI La Tuna has already allowed the occurrence of many a mishap.  In an email to his family, Mr. Balsiger described the events unfolding at FCI La Tuna since the beginning of the pandemic, highlighting the prison's almost certain exposure to an outbreak. *Email from Thomas Balsiger*, June 3, 2020, attached as Exhibit C. There are approximately 85 inmates in Balsiger's camp and they dorm together, two people per room, in close quarters (the rooms measure about 10 feet by 8 feet)– making social distancing impossible.[4] Neither can there be any social distancing in the showers or the bathrooms.  If an asymptomatic but diseased inmate or staff member enters the facility, he or she would, before long, pass the virus to everyone.[5] FCI La Tuna only received testing kits on May 27 and, as of this writing, no inmates have been tested. There is no hand sanitizer available. On June 1, when the assistant warden gathered all the inmates into a 20 foot by 30 foot room to inform them about the newly implemented lockdown, she did not wear a mask, and she openly admitted that the meeting violated social distancing standards. *See id.*

The fear that COVID-19 will reach FCI La Tuna is more than mere conjecture. The BOP website lists one staff member currently infected, and 3 who were infected but have recovered. *See* Federal Bureau of Prisons, COVID-19 Coronavirus, https://www.bop.gov/coronavirus/. Through June 1, 30 inmates from Balsiger's camp worked outside the prison with non-incarcerated workers; no one wore masks.  On May 27, a nurse taking Mr. Balsiger's temperature complained that she

---

[4] Further exacerbating the inability of inmates to social distance at FCI La Tuna is Mr. Balsiger's averment that on June 16th, 2020 he learned that 50 inmates from Camp 2 are being moved over to his Camp 1, increasing the total inmates in Camp 1 from about 85 to over 130.

[5] This has happened at FCI Lompoc and FCI Danbury, among others. *See 70% of Inmates Test Positive for Coronavirus at Lompoc Federal Prison*, L.A. Times (May 9, 2020, 10:55 AM), https://www.latimes.com/california/story/2020-05-09/coronavirus-cases-lompoc-federal-prison-inmates; *Federal Judge Demand Action at Danbury Federal Prison as COVID-19 Spreads*, Forbes (May 14, 2020, 9:16 AM), https://www.forbes.com/sites/walterpavlo/2020/05/14/federal-judge-demands-action-at-danbury-federal-prison-as-covid-19-spreads/#6518c0844959.

was pressured into coming to work despite her friend having tested positive for COVID-19. Balsiger's acquaintance (who works in the "facilities" area for his inmate job) informed him that prisoner exchanges continued through May 29, despite the fact that exchanges are the surest way for the virus to spread from prison to prison. *Id.; See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* CDC (Apr. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated May 24, 2020) ("There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including . . . transfer of incarcerated/detained persons between facilities and systems . . . .").

Finally, as mentioned, a corrections officer at FCI La Tuna tested positive for COVID-19 in April. *See* Jamel Valencia, *Staff at La Tuna Federal Correctional Institution Tests Positive for COVID-19*, K Fox 14 (Apr. 27, 2020), https://kfoxtv.com/news/local/staff-at-la-tuna-federal-correctional-institution-tests-positive-for-covid-19 ("A staff member at La Tuna Federal Correctional Institution tested positive for the coronavirus. The Bureau of Prisons' Office of Public Affairs confirmed the news on Monday."). And while "[t]hey said as of Sunday, no inmates had tested positive and just one staff member had the virus," *id.*, the rise in cases near the correctional facility may very well spread to the prisons, with devastating effects. *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, *supra.*

On May 15, Mr. Balsiger asked the camp administrator if he could designate a separate area for higher-risk inmates that operated under stricter social-distancing rules. The warden refused, saying that it was more important to keep the older inmates among those who are younger in order

7

to maintain maturity and discipline, thus further endangering the lives of Balsiger and other at-risk inmates. *See* Ex. C.

It is clear that FCI La Tuna's "extraordinary measures" cannot be relied upon to save Mr. Balsiger's life. Upon release, Mr. Balsiger would reside with his wife at 72XX Camino del Sol, El Paso, TX 79911, where he could quarantine himself appropriately like others having his high-risk profile. The pandemic is far from over: who could have foreseen the explosion of cases across this country even 2-3 months ago? The court should consider the historic trajectory of the pandemic and recognize that we must assume the worst in order to save lives, because we cannot know where COVID-19 will attack next.

## ARGUMENT

### A. The Court Has Authority to Reduce Thomas Balsiger's Sentence.

The compassionate release statute was first enacted as part of the Comprehensive Crime Control Act of 1984. It provided that a district court could not modify a final term of imprisonment except in four situations, one of which was the existence of "extraordinary and compelling reasons" warranting the reduction, as determined by the sentencing court. Although courts had the final decision-making authority over whether a sentence would be reduced, the statute imposed a gatekeeper—that authority could be invoked *only* upon a motion by the Director of the BOP. Without any action by the BOP, sentencing courts were powerless to reduce a prisoner's sentence, even if the court concluded that extraordinary and compelling reasons warranted the reduction. 18 U.S.C. § 3582(c)(1)(A)(i); *see also* PL 98–473 (H.J. Res 648), PL 98– 473, 98 Stat. 1837 (Oct. 12, 1984).

That changed when Congress enacted the First Step Act, which amended § 3582(c)(1)(A). *See* P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). Under the amended statute, a court may

now reduce a sentence for "extraordinary and compelling reasons" in two circumstances: (i) upon motion of the Director of the BOP requesting such relief; or (ii) "upon motion of the defendant," if the defendant has fully exhausted all administrative remedies to appeal the BOP's failure to bring a motion, <u>or</u> if 30 days has lapsed "from the receipt of such a request by the warden of the defendant's facility," whichever is earlier. 18 U.S.C. § 3582(c)(1)(A).

While Mr. Balsiger—according to one reading of the statute—has not exhausted all administrative remedies since he can appeal the warden's denial, many courts have held that once 30 days have passed from the filing date, the months-long appeals process is unnecessary before turning to the courts. *United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *7 (S.D.N.Y. Apr. 20, 2020) ("This administrative exhaustion regime could take *weeks*, if not *months*. True enough, the statute's 30-day lapse provision provides a judicial backstop—but even thirty days may be far too long for individuals at high risk for COVID-19."); *United States v. Guzman Soto*, No. 18-10086, 2020 WL 1905323 at * 5 (D. Mass. April 17, 2020) ("While a court may certainly decline to consider a motion where Defendant has not waited thirty days, nothing in the statutory scheme suggests that Congress intended to preclude the court from exercising judicial discretion and to take into account timeliness and exigent circumstances related to why the defendant seeks compassionate release." ); *United States v. Miamen*, 2020 WL 1904490 at *3 (D. R.I. Apr. 17, 2020) (holding that if the BOP denies defendant's request, or thirty days lapse, whichever occurs first, defendant is free to file a motion); *United States v. MacFarlane*, No. 19-10131-NMG, Dkt. 352, 2020 WL 1866311 at *1 (D. Mass. Apr. 14, 2020) (holding that the defendant had exhausted his administrative remedies where he requested compassionate release and the BOP denied that request, although 30 days had not lapsed and the defendant had not apparently pursued administrative appeal); *see also United States v. Scott*, 17-CR-156, 2020 WL 2508894, at *4 (E.D.

Wis. May 15, 2020) (dicta indicating that motion can be filed and considered for defendant who filed after BOP denial but before 30 day period ran). Going even further, many courts, including this one, have held that the exhaustion requirement can be excused if COVID-19 concerns are pressing. *Scott*, 2020 WL 2508894, at *5 ("I conclude that § 3582(c)(1) sets forth a claim-processing rule" giving the court jurisdiction to excuse the exhaustion requirement); *Unites States v. Lacy*, 15-CR-30038, 2020 WL 2093363, at *5 (C.D. Ill. May 1, 2020) ("Mandating the exhaustion requirement in this case and other cases around the country during the COVID-19 pandemic cannot be what Congress intended."); *United States v. Haney*, No. 19-CR-531, 2020 WL 1821988 at *4 (S.D.N.Y. Apr. 13, 2020) (exhaustion requirement in §3582 is a non-jurisdictional claims-process rule and Congressional intent not only permits waiver of 30-days but actually favors it in "current extreme circumstances.").

Here, the court can decide this matter because Balsiger's compassionate release request was denied and 30 days have passed since his initial filing.

**B.      Mr. Balsiger Presents Extraordinary and Compelling Reasons for Compassionate Release.**

**i.      COVID-19 continues to spread in federal prisons.**

By now, the details of the deadly global COVID-19 pandemic are well-known to the Court and the general public.  As of this filing, the COVID-19 respiratory disease has exponentially spread to over 140 countries, infecting more than 6,799,713 people, and causing more than 397,000 deaths. *See* World Health Organization, Coronavirus disease Situation Report 139 (June 7, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200607-covid-19-sitrep-139.pdf?sfvrsn=79dc6d08_2.

While the first known case of COVID-19 in the United States was only reported in late January, the virus has spread exponentially: there are now over 2 million cases, already having

caused 114,625 deaths, in the United States alone. *See Cases of Coronavirus Disease (COVID-19) in the U.S.*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited June 13, 2020).

Unfortunately, events of the past few weeks have foreclosed any possibility that COVID-19 will soon abate. On May 25, 2020, George Floyd was killed by law enforcement in Minneapolis, Minnesota, sparking international protests. Hundreds of thousands of people took to the streets in over 584 cities and towns in all fifty states. *See Tracking Protests Across the USA in the Wake of George Floyd's Death,* USA Today, https://www.usatoday.com/in-depth/graphics/2020/06/03/map-protests-wake-george-floyds-death/5310149002/ (last visited June 4, 2020). Many protesters did not practice social distancing, leading health officials, including the U.S. Surgeon General, to warn that there will be a spike in COVID-19 cases as a result. *Surgeon General Warns of Coronavirus Outbreaks From Floyd Protests*, CNN, https://www.cnn.com/2020/06/02/politics/surgeon-general-floyd-protests-coronavirus/index.html (last updated June 2, 2020).

As of this writing, there are more than 1,000 active cases and 100 deaths in El Paso County, Texas, where FCI La Tuna is located, with people in their 60's accounting for 21 of those deaths and exhibiting a much higher fatality rate (second only to people in their 70s). *See City/County of El Paso COVID-19 Results*, El Paso Strong, http://www.epstrong.org/results.php (last visited June 13, 2020). Local health officials are bracing for the eventuality that El Paso will become a COVID-19 hotspot. *See* Jala Washington, *El Paso Health Leader Says City Could Become Hot Spot if COVID-19 Positive Cases Increase*, K Fox 14 (May 27, 2020), https://kfoxtv.com/news/local/el-paso-health-leader-says-city-could-become-hot-spot-if-covid-19-positive-cases-increase ("'If the positivity rate keeps climbing then we will be having a lot of problems. If the positivity rate reaches

11

over 20 percent, we will be considered a 'hot spot,' said [El Paso Health Authority, Dr. Hector] Ocarranza.").

A state facility in Otero County, New Mexico, a mere thirty miles from FCI La Tuna, recently saw a massive COVID-19 outbreak. *100 More Virus Infections Occur in Otero County Prison Outbreak; Doña Ana County Surpasses 500 Cases*, ABC 7 (June 4, 2020), https://kvia.com/news/new-mexico/2020/06/04/100-more-virus-cases-occur-in-otero-county-prison-outbreak-dona-ana-county-surpasses-500-cases/. Also, there has been a large outbreak at Rogelio Sanchez State Jail, thirty miles south of La Tuna. *Rogelio Sanchez State Jail in East El Paso Surpasses 300 COVID-19 Cases***,** El Paso Times (June 5, 2020), https://www.elpasotimes.com/story/news/crime/2020/06/05/rogelio-sanchez-state-jail-surpasses-300-coronavirus-cases/3155652001/.

To be clear, this does not directly implicate the federal prison system or the BOP but it does establish how pandemic conditions exist in the geographic area of the prison and serves as a proxy for the likelihood COVID-19 has or will soon spread there given local residents surely make up the majority of prison staff at FCI La Tuna.

There is currently no cure and no vaccine for COVID-19. The only way to prevent the virus is to prevent it from spreading. In addition to frequent handwashing, the CDC recommends "social distancing" or "physical distancing" by maintaining a distance of at least six feet from other people, avoiding gathering in groups, and staying out of crowded places. *Prevent Getting Sick*, CDC (April 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited May 28, 2020). Additionally, the CDC recommends face masks be worn at all times in settings where social distancing is not possible. *Id.*

12

Because of the difficulty of social distancing, prisons are especially vulnerable to the spread of COVID-19. *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CDC (Apr. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated May 24, 2020); *see also Castillo v. Barr*, No. CV2000605TJHAFMX, 2020 WL 1502864, at *5 (C.D. Cal. Mar. 27, 2020) ("[T]he Government cannot deny the fact that the risk of infection in immigration detention facilities – and jails – is particularly high if an asymptomatic guard, or other employee, enters a facility.").

As of this writing, 6,059 federal inmates have officially tested positive for the virus as have 657 staff. *See Covid-19 Coronavirus*, Federal Bureau of Prisons https://www.bop.gov/coronavirus/ (last visited June 13, 2020). At least 82 federal inmates have died of the virus. *Id*. Due to under-testing, among other factors, these data are almost surely underreported. *United States v. Oreste*, 14-cr-20349 (S.D. Fla. Apr. 6, 2020) (Scola, J.) (BOP numbers are almost surely underreported).

**ii.      Federal courts are releasing prisoners across the country.**

As S.D.N.Y. Judge Furman recently framed the problem, "Realistically, the best—perhaps the only—way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible." *United States v. Nkanga*, 18-cr-713, 2020 WL 1529535, *1 (S.D.N.Y. Mar. 31, 2020).

The nation's courts are of one mind with Judge Furman. An overwhelming number of courts have granted compassionate release motions, many under the logic by which Mr. Balsiger would be released. Compassionate Release is granted even though COVID-19 may not yet have ravaged the particular prison where the petitioner is incarcerated, *United States v. Colvin*, 2020 WL 1613943 at *4 (D. Conn., Apr. 2, 2020) (noting defendant's multiple health conditions and inability

13

to social-distance in prison and concluding that "[i]n light of the expectation that the COVID-19 pandemic will continue to grow and spread over the next several weeks, the Court concludes that the risks faced by Defendant will be minimized by her immediate release to home") and with the majority of the sentence remaining. *See Gonzalez*, *infra*, 2020 WL 1536155 (releasing defendant two months into a 10-month sentence in light of medical issues; ordinarily these conditions would be manageable but "these are not normal times"). *See also United States v. Scparta*, 2020 WL 1910481 (S.D.N.Y. April 20, 2020) (releasing 55-year-old with high blood pressure and hypertension); *United States v. Sawicz*, 2020 WL 1815851, Case No. 08-cr-287, Dkt. No. 66 (E.D.N.Y. Apr. 10, 2020) (releasing child pornography offender based on "[t]he COVID-19 outbreak at FCI Danbury, combined with the fact that the defendant is at risk of suffering severe complications if he were to contract COVID-19 because of his hypertension"); *United States v. Muniz*, 09-cr-0199, 2020 U.S. Dist. LEXIS 59255, *5 (S.D. Tex. Mar. 30, 2020) (reducing a 188-month sentence to time served for a man with diabetes, renal disease, and hypertension); *United States v. Trent*, Case No. 16-cr-178, ECF No. 106 (N.D. Cal. Apr. 9, 2020) (granting compassionate release in light of COVID-19); *United States v. Clagett*, 2:97-cr-265-RSL (W.D. Wash. Apr. 9, 2020) (granting a stipulated motion for compassionate release in light of severe risks posed by COVID-19); *United States v. Plunk*, 3:94-cr-36-TMB (D. Alaska Apr. 9, 2020) (reducing two concurrent life terms to time served in light of COVID-19); *United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (granting compassionate release and waiving exhaustion requirement for defendant at serious risk from COVID-19); *United States v. Hansen*, 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020) (COVID-19 pandemic and medical problems justifies seven-month reduction in sentence); *United States v. Hakim*, No. 4:05-cr-40025-LLP, Dkt. No. 158 (D.S.D. Apr. 6, 2020) (reducing sentence by an extra 40 months under the First Step Act in light of

14

the extreme danger posed by COVID- 19); *United States v. Zukerman*, No. 1:16-cr-194-AT, 2020 U.S. Dist. LEXIS 59588, at *1 (S.D.N.Y. Apr. 3, 2020) (waiving exhaustion and granting immediate compassionate release in light of COVID- 19 to defendant convicted in multi-million dollar fraud scheme motivated by greed; "The severity of Zukerman's conduct remains unchanged. What has changed, however, is the environment where Zukerman is serving his sentence. When the Court sentenced Zukerman, the Court did not intend for that sentence to 'include a great and unforeseen risk of severe illness or death' brought on by a global pandemic"); *United States v. Foster*, No. 1:14-cr-324-02, Dkt. No. 191 (M.D. Pa. Apr. 3, 2020) (noting the "unprecedented" circumstances facing "our prison system" and finding that COVID-19 is an extraordinary and compelling basis for release; indeed, "[n]o rationale is more compelling or extraordinary"); *United States v. Edwards*, No. 6:17-cr-3- NKM, Dkt. No. 134 (Apr. 2, 2020) (granting compassionate release; "[h]ad the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in federal prison would expose him to a heightened and substantial risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not have sentenced him to the latter 18 months"); *Resnick*, 2020 WL 1651508 ("Releasing a prisoner who is for all practical purposes not deserving of compassionate release during normal times is all but mandated in the age of COVID-19"); *United States v. Colvin*, 2020 WL 1613943 (D. Conn. Apr. 2, 2020) (noting defendant's multiple health conditions and inability to social-distance in prison and concluding that "[i]n light of the expectation that the COVID-19 pandemic will continue to grow and spread over the next several weeks, the Court concludes that the risks faced by Defendant will be minimized by her immediate release to home"); *United States v. Perez*, No. 1:17-cr-513-AT, Dkt. No. 98 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release where "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the

15

potential consequences of doing so are extraordinarily grave"); *United States v. Rodriguez*, No. 2:03-cr-271-AB, 2020 U.S. Dist. LEXIS 58718, *2 (E.D. Pa. Apr. 1, 2020) (granting release after finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting that prisons are "tinderboxes for infectious disease"); *United States v. Williams*, No. 3:04-cr-95-MCR-CJK, Dkt. No. 91 (N.D. Fla. Apr. 1, 2020) (compassionate release in light of severe risk posed to defendant by COVID-19); *United States v. Marin*, No. 15-cr-252, Dkt. No. 1326 (E.D.N.Y. Mar. 30, 2020) (Releasing inmate "for the reasons stated in his motion, including his advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, [and] status as a non-violent offender . . ."); *United States v. Bolston*, 1:18-cr-382-MLB, Dkt. No. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility. . . during the COVID-19 outbreak justif[y] his immediate release from custody"); *United States v. Powell*, 1:94-cr-316-ESH, Dkt. No. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case); *United States v. Campagna*, 16-cr-78, 2020 WL 1489829, *3 (S.D.N.Y. Mar. 27, 2020) (granting motion for Covid-19 compassionate release, substituting outstanding term of incarceration with home confinement for man with compromised immune system).

### iii. Mr. Balsiger's serious health conditions and the elevated risk they create for him for death or serious injury from Covid-19 satisfies the extraordinary and compelling criteria of the statute.

"[A] defendant seeking compassionate release would need to demonstrate that his situation is extraordinary," otherwise "reliance on circumstances applicable to everyone in prison would appear to read the term 'extraordinary' out of the statute." *Scott*, 2020 WL 2508894, at *9-10.

16

It is entirely possible that COVID-19 could prove deadly to Mr. Balsiger should he contract it. Mr. Balsiger is 67 years old and suffers from hypertension, and angina. *Thomas Balsiger Medical Records*, at 3, 29 (attached as Sealed Exhibit D). He suffered three heart attacks, has three stent implants, and suffers from chronic coronary artery disease (atherosclerosis). *Id.* at 29.

These conditions make COVID-19 especially dangerous. Preliminary mortality rate analyses from a February 29, 2020, WHO-China Joint Mission Report indicated a mortality rate for individuals with hypertension at 8.4%. *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Org., 12 (Feb. 29, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-finalreport.pdf. In addition, those with myocardial injuries[6] (including old heart attacks and coronary artery disease)[7] are at an elevated risk for fatal COVID-19. Tao Guo et al., *Cardiovascular Implications of Fatal Outcomes of Patients With Coronavirus Disease 2019 (COVID-19)*, JAMA Cardiology (Mar. 27, 2020), https://jamanetwork.com/journals/jamacardiology/fullarticle/2763845:

> "*Mortality was markedly higher* in patients with elevated plasma TnT (troponin) levels than in patients with normal TnT levels. Compared with patients with normal TnT levels, those with elevated TnT levels were older and had a higher proportion of men. Patients with elevated TnT levels had significantly higher rates of comorbidities including hypertension [and] coronary heart disease. . . ." (emphasis added)

---

[6] Elevated cardiac troponin levels—extant in those with previous heart attacks, *See What is the Normal Range for Troponin Levels?*, Med. News Today, https://www.medicalnewstoday.com/articles/325415 (last updated June 7, 2019) ("The heart releases troponin into the blood following an injury, such as a heart attack. Very high troponin levels usually mean that a person has recently had a heart attack").

[7] *See* Philip D. Adamson et al., *High-Sensitivity Cardiac Troponin I and the Diagnosis of Coronary Artery Disease in Patients With Suspected Angina Pectoris*, Circ.: Cardiovasc. Qual. Outcomes, Feb. 2018, https://www.ahajournals.org/doi/full/10.1161/CIRCOUTCOMES.117.004227?url_ver=Z39.88-2003&rfr_id=ori:rid:crossref.org&rfr_dat=cr_pub%3dpubmed. ("Higher cardiac troponin concentrations were associated with obstructive coronary artery disease with a 5-fold increase across quintiles independent of known cardiovascular risk factors.")

17

More so, Mr. Balsiger is taking Lisinopril, an ACE inhibitor, which greatly exacerbates his risk of death or permanent damage. *See* Ex. D at 50; *Lisinopril*, Drugs.com, https://www.drugs.com/lisinopril.html ("Lisinopril is an ACE Inhibitor.") (medically reviewed by Sanjai Sinha, MD) (last updated Nov. 9, 2019); Lei Fang et al., *Are Patients with Hypertension and Diabetes Mellitus at Increased Risk for COVID-19 Infection?* 18 Lancet Respiratory Med. E21, Mar. 11, 2020, https://www.thelancet.com/pdfs/journals/lanres/PIIS2213-2600(20)30116-8.pdf :

> "Hypertension is treated with ACE inhibitors and ARBs, which results in an upregulation of ACE2. . . . These data suggest that ACE2 expression is increased in . . . treatment with ACE inhibitors and ARBs increases ACE2 expression. Consequently, the increased expression of ACE2 would facilitate infection with COVID-19. We therefore hypothesize that diabetes and hypertension treatment with ACE2-stimulating drugs increases the risk of developing *severe and fatal* COVID-19." (emphasis added)

*See also U.S. v. Roman,* 19 CR. 116 (KMW), 2020 WL 1908665, at *2 (S.D.N.Y. Mar. 27, 2020) (*"*Mr. Roman's age and medical condition elevate his risk of complications from the virus. Specifically, the fact that he takes Lisinopril, an ACE inhibitor, to treat his hypertension likely places him 'at higher risk for severe COVID-19 infection,'" *citing* Fang et al.)

Age acts to Mr. Balsiger's extreme detriment as well. Data released by the CDC indicates that approximately 80% of deaths from COVID-19 in the United States occur in individuals age 65 or older and that the fatality rate for individuals aged 65 to 84 could be as high as 11%. *Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States, February 12 – March 16, 2020*, CDC (Mar. 26, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm.

In the COVID-19 context, courts have routinely granted compassionate release for inmates with Mr. Balsiger's medical conditions and in his age group. *See Sawicz*, Case No. 08-cr-287, Dkt. No. 66 (releasing inmate based on "the fact that the defendant is at risk of suffering severe

complications if he were to contract COVID-19 because of his hypertension"); *Muniz*, 2020 U.S. Dist. LEXIS 59255, at *5 (reducing 188-month sentence to time served for man with diabetes, renal disease and hypertension); *Zukerman*, 2020 U.S. Dist. LEXIS 59588, at *1 (releasing a 75-year-old man to home confinement halfway through his 70-month sentence due to diabetes, coronary artery disease, hypertension, and obesity); *United States v. Doshi*, No. 13-20349, ECF No. 145 (E.D. Mich. Mar. 31, 2020) (recommending that the BOP release 64-year-old defendant with diabetes and hypertension to home confinement); *U.S. v. Saad*, 16-20197, 2020 WL 2251808, at *1 (E.D. Mich. May 5, 2020) (releasing a 71-year old man with chronic kidney disease, hypertension, and pulmonary hypertension—who served less than half of his sentence— to supervised home confinement).

> ### iv. The remaining criteria for reducing the length of Mr. Balsiger's sentence weigh strongly in favor of a sentence reduction.

In determining whether Mr. Balsiger's sentence should be reduced, the Court must decide, *inter alia*, whether he presents a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g) and U.S.S.G. § 1B1.13 (2). If he does not, the Court looks to the remaining factors outlined in 18 U.S.C. § 3553(a). All these factors weigh strongly in favor of relief in Thomas's case.

> #### 1. Mr. Balsiger Is Not a "Danger"

Thomas is not a danger to the community. He was convicted of a nonviolent, monetary crime and is 67 years old, a demographic that is highly unlikely to recidivate. *See* United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, p. 30 (December 2017), http://www.ussc.gov/sites/default/files/pdflresearch-and-publications/research-publications/20 17/20171207 Recidivism-Age.pdf ("Among offenders released younger than age 21, 67.6 percent were rearrested compared to 13.4 percent of those released age 65 or older. The

pattern is consistent across age groups, as age increases recidivism by any measure declined. Older offenders who do recidivate do so later in the follow-up period, do so less frequently, and had less serious recidivism offenses on average.").

Nor did the government suggest he was a danger to the community in its sentencing submission or anywhere else.

2.    *The Relevant § 3553(a) Factors Weigh Strongly in Favor of Relief*

Mr. Balsiger and his family went through a harrowing ordeal in the lead-up to his conviction and sentencing, Balsiger Sentencing Mem., ECF No. 973 at 13-14, and there is every indication that, considering his age, the 15 years since his indictment, and the enormous monetary loss and humiliation endured, Mr. Balsiger will be deterred from committing the crimes for which he was convicted. 18 U.S.C. § 3553(a)(2)(C). Today, as a result of the pandemic, he lives in constant fear for his health and worries for his family. It would be unconvincing to argue that general deterrence will be impacted by his release since these are extraordinary and unprecedented times; early release, even if conditioned on a period of home confinement, is necessary to save a man's life and will not be seen by the public at large as a disregard for the law. *Id.* (a)(2)(A) and(B).

**v.    The BOP has had difficulty properly protecting at-risk inmates.**

Some courts have deferred to the federal Bureau of Prisons, claiming that it has "experience combatting infectious diseases and has developed and implemented a multi-point plan to battle COVID-19." *United States v. Stevens*, 04-CR-222S, 2020 WL 2393306, at *6 (W.D.N.Y. May 12, 2020) That characterization does not stand up to scrutiny. After the outbreaks in Lompoc in late May, 2020, the Senate Committee on the Judiciary was moved to grill BOP Director Michael Carvajal and medical director Dr. Jeffery Allen on their COVID-19 response. *Statement on Examining Best Practices for Incarceration and Detention During COVID-19: Hearing Before the*

*S. Comm. on the Judiciary*, 116th Cong. (June 2, 2020),

https://www.judiciary.senate.gov/meetings/examining-best-practices-for-incarceration-and-detention-during-covid-19. When questioned by Senator Dianne Feinstein about the Lompoc outbreak, Dr. Allen openly admitted the difficulty of controlling outbreaks in prisons, saying "What happened at Lompoc has happened in many correctional facilities around the country and demonstrates the infectivity of the disease and the difficulty of controlling it in correctional environments." *Id.* (video of hearing at timestamp 1:08:50). Senator Richard Blumenthal excoriated the Director over the BOP's handling of cases at FCI Danbury in Connecticut. In *Martinez-Brooks v. Easter*, 3:20-CV-00569 (MPS), 2020 WL 2405350, at *1 (D. Conn. May 12, 2020), the court ordered the warden at FCI Danbury to release all at-risk inmates to home confinement. "The court found that your practices at Danbury 'amount to deliberate indifference to a substantial risk to serious harm to inmates in violation of the eighth amendment,'" Senator Blumenthal said. When the Senator asked Director Carvajal if the orders were being fulfilled, the Director pled ignorance. Senator Blumenthal also pressed the Director on the court order barring the use of the 50% marker in home confinement requests. Here too, the Director displayed his maladministration and did not know whether the policy had been changed to reflect the order. *Id.* (video at timestamp 2:16:00).

While these instances mirror the general difficulty governments have had in confronting these novel circumstances, they demonstrate the need to question the BOP's role as arbiter on prisoner safety. For example, Mr. Balsiger avers he was approved by FCI La Tuna for home confinement under the CARES act twice, only to be refused by the BOP office in D.C.

This disparity seems to be the result of what may be, at best, gross negligence, and at worst, some bad acting as well. AG Barr's two memos instructed the BOP to release minimum risk

prisoners to home confinement, yet recent investigations have uncovered a gross disregard for those instructions. Apparently, the BOP clandestinely amended the requisite PATTERN score necessary for an inmate to be considered minimum risk to the community. Thus, inmates at-risk for COVID-19 are being denied home confinement because they, only now, are considered a risk to their communities. *See* Ian MacDougall, *Bill Barr Promised to Release Prisoners Threatened by Coronavirus — Even as the Feds Secretly Made It Harder for Them to Get Out*, ProPublica (May 26, 2020), https://www.propublica.org/article/bill-barr-promised-to-release-prisoners-threatened-by-coronavirus-even-as-the-feds-secretly-made-it-harder-for-them-to-get-out ("Fewer prisoners have been released than was expected when the attorney general made his announcement, lawyers say. About 3,050 inmates have been moved to home confinement as of May 21, Bureau of Prisons records show. That's around 1.8% of the people under the bureau's supervision. That figure is significantly smaller than the roughly 20% of inmates who fall into the minimum risk category (though it's not automatic that all of them would qualify for release) under the 2019 rules."). When Senator Sheldon Whitehouse mentioned this article to Director Carvajal at the June 2 hearing, Director Carvajal claimed the revised PATTERN memo was a draft; however, he did not clarify which version the BOP was operating under, saying cryptically, "the approved version." *Hearing Before the S. Comm. on the Judiciary, supra* (video at timestamp 1:37:38).

Also, in one instance, the BOP attempted to resist a federal court order to promote home confinement as a viable safety measure, prompting the Supreme Court to get involved. The Supreme Court decided to deny the BOP's injunction against a federal judge's order regarding the Elkton Prison. The judge accused the BOP of "thumbing their noses" at AG Barr's directives; while 837 inmates had been deemed high-risk, none of them had been moved to home confinement. The government sought an injunction against the order. *See* Order in Pending Case, *Williams v. Wilson*,

20-cv-794 (May 26, 2020) (mem.), https://www.scotusblog.com/wp-content/uploads/2020/05/19A1041-Williams-v.-Wilson-Order.pdf.; Amy Howe, *Court Rejects – At Least for Now – Government's Request to Block Ohio Prisoner Release Plan*, SCOTUS Blog (May 26, 2020, 2:08 PM), https://www.scotusblog.com/2020/05/court-rejects-at-least-for-now-governments-request-to-block-ohio-prisoner-release-plan/#more-294066.

Thus, we turn to the federal court as the last line of defense against what one academic has called "The New Death Penalty." Douglas A. Berman, *The New Death Penalty: COVID Has Now Killed More Than 500 US Prisoners and Prison Staff According to UCLA Law Data*, Sentencing & L. Pol'y Blog (May 27, 2020), https://sentencing.typepad.com/sentencing_law_and_policy/ ("[B]y killing many hundreds of incarcerated persons, COVID-19 has turned all sorts of other sentences into functional death sentences.").

## CONCLUSION

For all the foregoing reasons, Mr. Balsiger respectfully requests that the Court take this opportunity to grant a reduction in his sentence based on extraordinary and compelling reasons and reduce his prison sentence to time served, with or without conditions of home confinement.

Respectfully submitted this 16th date of June, 2020.

/s/_____
Chris Donovan
Bar No. 1055112
Counsel for Mr. Balsiger
Pruhs & Donovan, S.C.
757 N. Broadway, 4th Floor
Milwaukee, WI 53202
Tel: 414-221-1950
Fax: 414-221-1959

23