# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
        **Plaintiff,**

  **v.**                                **Case No. 07-CR-57**

**THOMAS C. BALSIGER**
          **Defendant.**

---

## <u>DECISION AND ORDER</u>

Defendant Thomas Balsiger moves for sentence modification pursuant to 18 U.S.C. § 3582(c)(1)(A).  For the reasons that follow, I deny his motion.

## I. FACTS AND BACKGROUND

The underlying facts of the case are set forth in the Seventh Circuit's decision affirming defendant's conviction on direct appeal:

> In 2000 Thomas Balsiger took the helm of International Outsourcing Services or IOS, one of the nation's largest coupon processing companies. When a consumer uses a coupon at a supermarket, the retailer becomes entitled to reimbursement from the manufacturer. IOS served as an intermediary in this process. It contracted with retailers, including large retail chains as well as small, independently owned stores (known as Rapid Pay clients), to collect and sort coupons redeemed at the retailers' stores and then to submit invoices for reimbursement either directly to the manufacturer or indirectly to the manufacturer's agent. During the period at issue, the two main agents for manufacturers were NCH Promotional Services and Carolina Manufacturer's Services.
>
> While manufacturers reimbursed nearly all coupons in-voiced on behalf of IOS's large retail clients, they typically rejected more than 60% of coupons submitted on behalf of smaller, Rapid Pay clients due to fraud concerns. Seeking to maximize reimbursements, Balsiger developed a scheme to deceive manufacturers by falsely invoicing Rapid Pay coupons as if they had been redeemed at IOS's larger retail clients. This ploy—known within IOS as "alternative invoicing"—included invoicing unused coupons as if shoppers had

legitimately redeemed them. To avoid detection, Balsiger directed employees at IOS's plants in Mexico to make new coupons look as if they had been used by causing them to become wrinkled and tattered.

Despite efforts to conceal the scheme, in March 2007, IOS, Balsiger, and ten other defendants were indicted for wire fraud. A superseding indictment alleged losses to manufacturers exceeding $250 million and detailed Balsiger's efforts to thwart the investigation into IOS's invoicing practices by, for example, destroying records and coaching employees to lie to authorities.

Ten years of litigation followed. Balsiger's retained counsel died in July 2014. The district court conducted multiple hearings over several months to address Balsiger's representation, ultimately concluding that he waived his right to counsel by repeatedly refusing to retain an attorney despite having the means to do so. While each of Balsiger's co-defendants either had their cases dismissed or pleaded guilty, Balsiger proceeded to trial in the fall of 2016. He represented himself during a five-week bench trial, at which the court heard testimony from 32 witnesses, including nine IOS employees who identified Balsiger as the mastermind behind the fraudulent scheme to deceive manufacturers. The court also heard testimony from manufacturers impacted by Balsiger's scheme. For his part, Balsiger admitted diverting coupons from smaller stores and invoicing them as if they had been redeemed at IOS's larger retail clients, but insisted this practice was limited to manufacturers represented by NCH Promotional Services (counts 1-15) and was permissible under IOS's contract with NCH.

On December 5, 2016—ten years to the day of the original indictment—the district court rendered its verdict. The court found Balsiger not guilty of the wire fraud alleged in counts 1-15, involving NCH clients, and guilty of counts 16-25, involving Carolina Manufacturer's Services clients. The court also convicted Balsiger of conspiracy to not only commit wire fraud but also obstruct justice. The court sentenced Balsiger to 120 months' imprisonment, ordered restitution of $65 million and entered a forfeiture judgment totaling $21.2 million.

United States v. Balsiger, 910 F.3d 942, 946-47 (7th Cir. 2018). Judge Clevert conducted the trial and imposed sentence. The case was later reassigned to me due to Judge Clevert's retirement.

In imposing the original sentence, Judge Clevert note that in all the mail fraud cases he had handled over 20 years, "this is beyond anything that I've ever seen. It is undoubtedly sophisticated[.]" (R. 1020 at 67.) He further noted that defendant "orchestrated much of what

2

was done and was at the fulcrum." (Id. at 68.) He acknowledged defendant's age and significant health issues, relying on those factors to impose a sentence below the guideline range of 324-405 months and below the government's recommendation of 180 months. (Id. at 98, 129, 131.) He nevertheless found probation, as suggested by the defense, "totally inappropriate." (Id. at 131.) He explained: "Your leadership in the wire fraud and obstruction scream in this Court's view for a period of incarceration." (Id. at 132.) He noted that the consuming public and coupon industry had been affected, and the administration of justice had also been affected by defendant's obstruction. (Id. at 130.) He specifically commented on defendant's unwarranted attacks on the prosecution team, as well as his conduct towards witnesses, noting defendant was a "Jeckyll-and-Hide figure." (Id. at 130.) He concluded: "Your efforts to threaten the prosecutors into dropping charges based upon your suggestion that you would take personal action against them was beyond the pale. I have never seen anything like that except one time and that was an occasion when as a young prosecutor people threatened to kill me[.]" (Id. at 131.)

Defendant is currently serving his sentence at FCI La Tuna, with a projected release date of October 11, 2025.[1] On June 16, 2020, defendant, through counsel, filed the instant motion for sentence modification, arguing that his prison term should be reduced to time served based on "extraordinary and compelling" reasons. Specifically, he contends that his advanced age and medical problems place him at grave risk due to the COVID-19 pandemic. The government acknowledges that defendant may be at greater risk but nevertheless opposes release given the serious nature of the offenses, the amount of time remaining on the

---

[1]Defendant notes that he could be released in as soon as 2-½ years under the BOP's elderly pilot program. (R. 1098 at 4.)

3

sentence, and the fact that defendant's medical condition is stable and well-controlled.

## II. DISCUSSION

**A.    Compassionate Release Standards**

Pursuant to the First Step Act of 2018, the district may grant what is commonly known as "compassionate release." The statute provides, in pertinent part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission;

18 U.S.C. § 3582(c)(1)(A)(i).[2]

The statute does not define the term "extraordinary and compelling reasons." Rather, Congress instructed the Sentencing Commission, in promulgating general policy statements regarding the sentence modification provisions in § 3582(c)(1)(A), to describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. See 28 U.S.C. § 994(t). The Commission's policy statement provides:

––––––––––––––––––––

[2]The statutory language indicating the defendant must first request compassionate release from the warden before applying to the court is often referred to as the statute's "exhaustion" requirement. See United States v. Scott, No. 17-CR-156, 2020 U.S. Dist. LEXIS 85554, at *9-16 (E.D. Wis. May 15, 2020) (discussing this provision).

4

Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

(1)    (A) extraordinary and compelling reasons warrant the reduction . . .

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13. The commentary to the policy statement indicates that extraordinary and compelling reasons exist under these circumstances:

(A) Medical Condition of the Defendant.—

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

5

> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>
> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

The Commission has not updated the policy statement, which purports to require a motion from the director of the Bureau of Prisons, see U.S.S.G. § 1B1.13 cmt. n.4, since the passage of the First Step Act, which allowed defendants to bring their own motions. "As a result, a growing consensus of courts across the country have concluded that, after the First Step Act, the Commission's policy statement does not constrain a court's independent assessment of whether extraordinary and compelling reasons warrant a sentence reduction under § 3582(c)(1)(A)." United States v. Somerville, No. 2:12-CR-222-NR, 2020 U.S. Dist. LEXIS 93935, at *15 (W.D. Pa. May 29, 2020). In Scott, 2020 U.S. Dist. LEXIS 85554, at *17-18, I adopted this position.

Giving the statutory terms their ordinary meaning, a defendant seeking compassionate release would need to demonstrate that his situation is extraordinary, i.e., beyond what is usual, customary, regular, or common, and his need for release compelling, i.e., irreparable harm or injustice will result if relief is not granted. Id. at *20; see also United States v. Ramirez, No. 17-10328, 2020 U.S. Dist. LEXIS 83363, at *6 (D. Mass. May 12, 2020) ("The policy contained in section 1B1.13 serves as helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive.") (internal quote marks

6

omitted).  In the context of the COVID-19 pandemic, courts have found that modification may be warranted if the prisoner demonstrates that he is particularly vulnerable to the virus based on his age, health status, or other specific circumstances, but they have tended to deny compassionate release requests based on general concerns about possible exposure in prison. E.g., United States v. Dover, No. 14-CR-196, 2020 U.S. Dist. LEXIS 133340, at *16-17 (E.D. Wis. July 28, 2020); see also United States v. Thomas, No. 1:11-CR-22, 2020 U.S. Dist. LEXIS 172963, at *6-7 (N.D. Ind. Sept. 22, 2020) (explaining that § 3582(c)(1)(A) contemplates a sentence reduction based on the particular circumstances of where the defendant is housed and his personal health conditions).

Finally, if the court decides that extraordinary and compelling reasons have been shown, it must also consider the applicable § 3553(a) factors to determine whether the sentence should be modified.  Those factors include: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for the sentence imposed to provide just punishment, deterrence, protection of the public, and correctional treatment; (3) the kinds of sentences available; (4) the sentencing guideline range; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to the victims of the offense.  18 U.S.C. § 3553(a).  In some cases, a court may find that the relevant § 3553(a) factors outweigh the extraordinary and compelling reasons warranting compassionate release and/or that release would undermine the goals of the original sentence.  United States v. Black, No. 1:11-cr-00083, 2020 U.S. Dist. LEXIS 142523, at *11 (S.D. Ind. Aug. 10, 2020); United States v. Bartlett, No. 06-CR-273, 2020 U.S. Dist. LEXIS 101393, at *13-14 (E.D. Wis. June 9, 2020); see also U.S.S.G. § 1B1.13(2) (stating that release should be denied if the defendant would pose "a

7

danger to the safety of any other person or to the community").

**B.    Analysis**

    **1.    Exhaustion**

Defendant indicates that he made a request for compassionate release to the warden, which was denied.  (R. 1098 at 2, 4-5, Ex. A & B.)  The government agrees that defendant has satisfied the statute's "exhaustion" requirement.  (R. 1100 at 10 n.5.)  I will accordingly address the motion on the merits.

    **2.    Extraordinary and Compelling Reasons**

Defendant indicates that the federal prisons are experiencing a widespread outbreak of COVID-19, and that prisoners are at greater risk of exposure due to the nature of incarceration.  (R. 1098 at 1-2, 13.)  He also discusses the specific conditions at the FCI La Tuna camp, where about 85 inmates dorm together, two people per room, in close quarters making social distancing impossible.  (Id. at 6, Ex. C at 1.)  He further contends that testing at the camp is feeble, hand sanitizer unavailable, and mask-wearing inconsistent (id. at 6, Ex. C at 3), and that staff members at the camp have tested positive (id. at 7, Ex. C at 4).[3]  He claims that the camp administrator has refused to separate older inmates, saying it was more important to keep older and younger prisoners together in order to maintain disciplines.  (Id. at 7-8, Ex C at 5.)  In sum,

---

[3]According to the BOP's website, 17 inmates and four staff members have tested positive, and no deaths have been reported, at FCI La Tuna.  https://www.bop.gov/coronavirus/ (last visited Sept. 22, 2020).  The website does not state how many of these positives relate to the satellite camp where defendant is housed.  In a later submission, the government indicates there are no positives at the camp.  (R. 1107.)  In his original motion, defendant notes an outbreak at a nearby state jail, but he concedes the BOP is not in charge of that facility.  (R. 1098 at 12.)

8

he contends that the measures taken at his facility cannot be relied upon to keep him safe,[4] whereas if released he can reside with his wife and quarantine.  (Id. at 8.)

Defendant further indicates that he is at particular risk due to his age (67) and serious health conditions (hypertension and coronary artery disease with a history of heart attacks).  (Id. at 2, 17.)  He cites studies indicating that persons with these conditions, and who take the medications he does, have higher mortality rates.  (Id. at 17-18.)  He also cites CDC data on the heightened risk faced by the elderly.  (Id. at 18.)

In its response, the government indicates that defendant has made numerous false allegations regarding the conditions at FCI La Tuna.  (R. 1100 at 6.)  The government further indicates that defendant falsely alleges neglect of his medical condition, attaching medical records reporting that he recently declined a cardiology referral because he "wants to wait until the results of his court case are known."  (R. 1100 at 6, R. 1102 at 2.)  He further admitted at a recent visit that he was not taking his prescribed medication because he wanted to be evaluated without taking it.  (R. 1100 at 6-7, R. 1102 at 1.)  The government also denies defendant's claims regarding lack of testing and positive results at the camp.  (R. 1100 at 7.)  The government notes that, given the infection rate in the El Paso area (where defendant proposes to live on release) his risk of infection may not be reduced should his request be granted.  (R. 1100 at 7-8.)

The government concedes that defendant has heart issues but disputes the seriousness of his condition, including his claimed number of heart attacks.  (R. 1100 at 8-9.)  The government indicates that defendant used his health issues to manipulate the original

---

[4]Later in his motion he contends that the BOP cannot be trusted to care for at-risk inmates or to properly consider them for release under the CARES Act.  (R. 1098 at 20-23.)

9

proceedings. (Id. at 1100.) The government further notes that, based on review of the medical records, defendant's condition has remained stable or even improved while incarcerated. (R. 1100 at 9-10; e.g., R. 1098-4 at 1, noting: "Most recent EKG demonstrated no significant abnormalities.".) The government concludes that defendant appears to be exaggerating his health problems to manipulate these proceedings as well.

Despite these suspicions, the government does not dispute that defendant's history of coronary artery disease places him in a vulnerable category that the court could view as an exceptional circumstance. However, the government asserts that the court should assess the objective evidence when weighing his condition against the evidence that release would run counter to the § 3553(a) factors. (R. 1100 at 10.) The government later acknowledges that when an inmate presents a chronic medical condition identified by the CDC as a risk factor for a severe outcome from COVID-19 he may be eligible for compassionate release. The government further acknowledges that defendant's coronary artery disease presents such a risk factor. (R. 1100 at 13.) However, the government contends that defendant has failed to demonstrate how moving from a prison with no cases to a city deemed a hotspot will decrease his risk. (R. 1100 at 13-14.)

In supplemental pro se letters asking me to accelerate my decision, defendant indicates that his facility has inexplicably resumed normal operations, that his panic increases by the day (R. 1104), and that the threat to his life has become more serious because he is slated to be moved out of the "quarantine unit" to a "workers unit" (R. 1106). In response, the government indicates that these letters serve as further examples of defendant's willingness to provide false information. Contrary to his claims, FCI La Tuna has not resumed normal operations and, despite his claims of panic, defendant has not been following safety protocols including wearing

10

a mask.  (R. 1105.)  The government further notes that although a number of inmates at La Tuna have tested positive, none are at the satellite camp where defendant is housed.  (R. 1107 at 1.)  And, although defendant is slated for transfer to a different housing unit within the camp, he will remain in the same inmate labor pool and thus will not be required to work in the warehouse and should have no contact with anyone in the community.  (R. 1107 at 1-2.)  Finally, despite his claims that he cannot protect himself in prison, the government notes that he continues to refuse to wear a mask, resulting in disciplinary action.  (R. 1107 at 2.)

Ultimately, because I agree with the government that the motion should be denied under § 3553(a), I will assume, underline arguendo, that defendant's age and health issues could support compassionate release, despite questions about the sincerity of his particular claims. I thus proceed to the final step in the analysis.

### 3.    Danger/§ 3553(a) Factors

Defendant argues that given his age, lack of prior record, and the non-violent nature of the offense, he is not a danger to the community.  (R. 1098 at 19-20)  He further argues that the relevant § 3553(a) factors weigh in favor of relief, stating that given his age (a point when statistics suggest a low recidivism rate), the 15 years since his indictment, and the enormous monetary loss and humiliation he endured, he will be deterred from committing further crimes. (Id. at 20.)  Finally, he contends that, given our unprecedented times, early release will not harm general deterrence or respect for the law.  (Id. at 20.)

The government counters that defendant's conduct throughout the pendency of the case—intimidating witnesses, threatening the prosecutors, and otherwise seeking to obstruct justice—suggests that he does pose a danger.  (R. 1100 at 15.)  The government states that defendant's false attacks and abuse have continued even after sentencing, pointing to various

11

of his filings in his pending collateral attack under 28 U.S.C. § 2255, his lawsuit against a former co-defendant in state court, and his filing of complaints against his former lawyer. (R. 1100 at 16.) The government contends that defendant's pattern of obstruction suggests that he views himself as above the law. (R. 1100 at 17.) Finally, the government notes that defendant has maintained—and continues to maintain—that his conduct was lawful, which suggests that he has not been deterred. (R. 1100 at 18.) The government concludes that allowing release after defendant has served just 1/3 of the term imposed would upset the careful balancing performed by Judge Clevert, who, after handling the case for 10 years, concluded that a significant prison term was needed to satisfy the purposes of sentencing, rejecting the notion that defendant's age and health issues supported a more lenient sentence. (R. 1100 at 18-20.)

In reply, defendant points to my finding, in ruling on defendant's earlier motion for bail pending appeal, that he does not pose a danger. (R. 1103 at 9.) He also clarifies that he does not pose a "violent danger," as some courts have discussed in ruling on compassionate release motions. (R. 1103 at 10.) While conceding that he has been convicted of serious crimes, defendant argues that he does not deserve a death sentence. (R. 1103 at 10.) He further contends that he has conducted himself as a model prisoner. (R. 1103 at 10-11.)

Regarding the government's § 3553(a) arguments, defendant notes that he will be eligible for home confinement in as little as 2-½ years, so the reduction is not as dramatic as the government suggests. Further, when Judge Clevert imposed the 10-year sentence, defendant was not in danger of dying in prison due to a pandemic. (R. 1103 at 12.) Viewed in light of the pandemic, defendant contends, the § 3553(a) factors balance differently. (R. 1103 at 13.) Finally, defendant notes that he will still have three years of supervised release

12

to serve, and that the court could impose a home confinement condition if it found further control necessary.  (R. 1103 at 13-14.)

I find that the relevant § 3553(a) factors outweigh the extraordinary and compelling reasons presented in this case.  First, defendant committed extremely serious crimes, causing a loss of more than $65,000,000, using a method of calculation "quite favorable" to him.  Balsiger, 910 F.3d at 956.  Judge Clevert characterized the scheme as "beyond anything that I've ever seen" and "undoubtedly sophisticated."  (R. 1020 at 67.)  He further noted that defendant occupied a leadership role (id. at 132), "orchestrated much of what was done and was at the fulcrum."  (Id. at 68.)  Perhaps more seriously, defendant engaged in a pattern of obstruction, including threats to witnesses, as well as attacks on the prosecution team.  Reducing defendant's sentence would depreciate the seriousness of his crimes.  See United States v. Rogers, No. 16 CR 575, 2020 U.S. Dist. LEXIS 148949, at *5-6 (N.D. Ill. Aug. 17, 2020) (finding that sentence reduction would depreciate seriousness of the offense where the defendant stole more than $23 million from 26 victims, and allegedly continued to engage in misconduct while the case was pending, receiving a sentence of 144 months despite guideline range of 262-327); United States v. Saunders, No. 18-cr-00797-1, 2020 U.S. Dist. LEXIS 134051, at *9 (N.D. Ill. July 29, 2020) (denying compassionate release, despite the defendant's serious health issues, because the offense was extremely serious).[5]

_____

[5]Judge Clevert considered defendant's age and medical condition in granting a substantial variance from the guidelines in this case.  Defendant argues that the calculus is different now, but as the Saunders court noted in rejecting a similar argument, the existence of COVID-19 does not warrant the release of every federal prisoner with health conditions that make him more susceptible to the disease.  2020 U.S. Dist. LEXIS 134051, at *10.

13

Second, defendant has served just a fraction of his sentence.[6]  Given the extensive nature of the fraud and obstruction, early release would diminish the deterrent effect of the original sentence.  See Rogers, 2020 U.S. Dist. LEXIS 148949, at *6-7 (denying release where the defendant had served about 1/4 of the sentence, and the court was concerned that a reduction would diminish the deterrent effect); Saunders, 2020 U.S. Dist. LEXIS 134051, at *10 (denying release where the defendant had served less than 1/3 of his sentence because such a substantial reduction would not accurately reflect the gravity of the crimes).

Third, there is no indication that the BOP is unable or unwilling to address defendant's serious health issues.  See Rogers, 2020 U.S. Dist. LEXIS 148949, at *7 (citing 18 U.S.C. § 3553(a)(2)(D)).  Indeed, as discussed above, it appears that defendant has declined to take medication and accept medical referrals, and that he may not be following safety protocols put into place by the BOP to combat the spread of COVID-19.

### III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion (R. 1098) is denied.

Dated at Milwaukee, Wisconsin, this 23rd day of September, 2020.

/s Lynn Adelman
LYNN ADELMAN
District Judge

---

[6]Perhaps defendant will be released before October 2025 under the elderly inmate pilot program.  Nevertheless, he has served a small portion of the sentence originally imposed.

14